[No. F005637. Fifth Dist. Jan. 6, 1987.]

MERCED COUNTY SHERIFF'S EMPLOYEES' ASSOCIATION et al.,
Plaintiffs and Appellants, v.
COUNTY OF MERCED et al., Defendants and Appellants.

Counsel

Barry J. Bennett, Thomas M. Sharpe and Bennett & Sharpe for Plaintiffs and Appellants.

Allen, Cornell & Mason, Allen, Cornell, Palgar & Proietti and Dennis A. Cornell for Defendants and Appellants.

Opinion

FRANSON, Acting P. J.—

STATEMENT OF THE CASE

This appeal turns on the interpretation of two "memoranda of understanding" (MOU), one between respondent Merced County (the County) and petitioner Merced County Sheriff's Employees' Association (the Sheriff's Association), the other between the County and petitioner Merced

County Professional Firefighters' Association Local 1396 (the Firefighters' Association), pertaining to salary increases to petitioners' members for a three-year period commencing July 1, 1985. Petitioners sought a writ of mandate in the superior court ordering the County to follow the agreements according to petitioners' interpretation.

The trial court ruled that the salary increase formula in the Sheriff's Association MOU was ambiguous, and that the parties' consent to that formula was based on a mutual good faith mistake in its meaning; it ordered the paragraph rescinded and renegotiated. The Firefighters' Association salary formula, however, with additional explanatory language, was found by the court to be unambiguous and binding on the parties "in accordance with its express terms." This appeal and cross-appeal followed.

For the reasons to be explained, we hold the Sheriff's Association agreement to be enforceable according to the interpretation placed on it by the Sheriff's Association. However, we hold the Firefighters' Association agreement to be unenforceable because of its irreconcilable ambiguity and the failure of the parties to reach a meeting of the minds. We reverse the judgment.

## STATEMENT OF THE FACTS

In the summer of 1983, representatives of the County entered into separate negotiations with representatives of the Sheriff's Association and the Firefighters' Association. The negotiations were to discuss the implementation of successor MOUs to replace those due to expire in 1983. Negotiations were interrupted by court proceedings brought by petitioners challenging a 5 percent reduction in wages and benefits by the County. Having won that lawsuit, petitioners resumed separate negotiations with the County in January 1984.

On or about February 17, 1984, during one of the negotiating sessions between the County and the Sheriff's Association, the parties believed they had achieved an agreement on future salaries. This agreement was memorialized as paragraph 7 of a new MOU, executed February 24. The meaning of subparagraphs a, b, and e of paragraph 7 is undisputed. The Sheriff's Association and the County were jointly to conduct a nine-county survey of "Deputy II" salaries. The salaries included in the survey were to be determined by averaging the bottom and top salary for deputy II positions in each of the nine counties. Then the highest and lowest of the nine average salaries would be discarded, and the average of the remaining seven salaries taken.

Subparagraph c of paragraph 7 is the problem. The Sheriff's Association, whose representative, Barry J. Bennett, drafted the MOU, maintains that

subparagraph c functions as follows. In July 1985, deputy II positions were to be paid their prior salary plus 90 percent of the *differential* between that salary and the survey average. In 1986 and 1987, multipliers of 95 and 100 percent respectively would be employed. On the other hand, the County argues that the paragraph means that in July 1985 the deputy II position pay would be no less than 90 percent of the survey average; in 1986, no less than 95 percent of such average; and in 1987, no less than 100 percent of such average. (Precise percentages could not be provided for, as the County required all pay raises to be rounded off to the nearest 2.5 percent.) Thus, the distinction: the Sheriff's Association understood the percentages would apply to the *differential* between the existing salary and the survey average, while the County understood the percentages would apply to the survey average itself.

The trial court received the following extrinsic evidence in support of the parties' respective interpretations of the meaning of paragraph 7c. Kenneth Thurman, a deputy sheriff and member of the Sheriff's Association executive committee, testified that at the negotiating session on February 14, 1984, a proposal was made to the County's representatives (William Gnass, county counsel, and Gregory Wellman, deputy county administrative officer) that a salary increase be structured on 90, 95 and 100 percent of the differential between the nine-county salary average and the Merced County salary, the nine-county survey to be conducted on a yearly basis. Wellman and Gnass said they would discuss the proposal with the County Board of Supervisors (Board) and "come back again with us." According to Thurman, at the next meeting, on February 17, Mr. Wellman said that he and Gnass had discussed the matter with the Board, and the Board "was giving them guidelines to go ahead with the proposal." Wellman said his office had done a preliminary survey of the nine counties and had prepared a document (petitioners' exhibit No. 2) showing the salary range for each county and a percentage difference between the nine-county average and the Merced County average of 13.66 percent. Thurman testified that he then asked, "I see a lot of salaries and comparisons, ... but for practical purposes if we were to initiate this [increase] today, where would we stand?" Wellman and his secretary Lou Ann Parsons then made some calculations, and Wellman stated that taking 90 percent of the 13.66 differential would give 12.294 percent and rounding to the nearest 2½ percent would produce a figure of 12.5 percent which, according to Thurman, he understood would be the basis of a salary increase if the increase were effective immediately. Because the County had already agreed to reinstate a 5 percent salary cut previously instituted, Thurman understood that the 12½ percent would be reduced by 5 percent for a net 7½ percent salary increase if instituted immediately. Mr. Wellman then wrote in pencil at the bottom of petitioners' exhibit No. 2 opposite the words "% Difference (13.66)" the following: "X .90 = 12.294 = 12.5 %."

Thurman denied hearing any reference to or mention by the County representatives at the February 17 meeting of an increase of salary based on a percentage of the nine-county salary average.

Barry Bennett, legal counsel for the Sheriff's Association who was present at all of the negotiating sessions and who drafted the contract, testified that an agreement was reached on February 17 whereby the deputies would receive a salary increase on July 1, 1985, based on a "formula." The formula was to be arrived at by summarizing nine counties, throwing out the highest and lowest counties, averaging the top and bottom range of each county, comparing that average with the Merced County salary "to determine how high, if at all, it was above the Merced Deputy II salary. [¶] During the first year, as of July 1, 1985, the increase ... was to be 90 percent of *that difference.* That is, the difference between Merced and the average salary of the other counties." (Italics added.) The same formula would apply in 1986, "the increase ... to be based on ninety-five percent of the difference. And then—as of July 1, 1987, the Deputies would be brought to one hundred percent of parity."

After an agreement was supposedly reached on February 17, Bennett prepared a written draft which he testified "embodied my understanding of the agreement" and delivered it along with an accompanying letter dated February 22, 1984, to Mr. Gnass, the county counsel, for his review. Bennett met with Gnass on February 23 and they went over the draft, made some revisions not pertinent to this litigation, and agreed that Gnass was to type the final document for signature by the parties. The final contract as approved by both Bennett and Gnass was signed on February 24, 1984, by Jorge Perez, president of the Sheriff's Association and Albert Goman, chairman of the Board.

Within a few days, a dispute surfaced over the meaning of paragraph 7c. According to Mr. Bennett, he brought the dispute to Mr. Gnass's attention, and Gnass became very angry; he said that Bennett's interpretation of the meaning of paragraph 7c was not the proposal that Gnass had presented to the Board in getting their approval. At this point, Bennett asked Gnass to read the "last two phrases" of paragraph 7c. After doing this, Gnass replied, "I should have read it more carefully."

Bennett, like Thurman, at no time could recall any proposal or comments by the County to the effect that the salary increase would be based on a percentage of the average survey salary.

Gregory Wellman testified for the County. He had been the chief spokesperson for the County during the Sheriff's Association negotiation.

Mr. Wellman testified that he did not recall any proposal by the Sheriff's Association reflecting a salary increase based on a specified percentage of the difference between the survey average and the Merced salary. Based on what he understood had been proposed by the deputies at the February 14 meeting, Wellman had presented to the Board in closed session a proposed wage increase that would "Bring deputy II benchmark to 90%, 95% and 100% of the *average salary* in the 9-county survey over a 3 year period . . . ." (Italics added.) This proposal to the Board was written in large colored print on butcher paper and was received in evidence below as respondents' exhibit E. The Board authorized Wellman and Gnass to accept this proposal and, according to Wellman, on February 17 he orally presented the proposal to the Sheriff's Association's representatives as per the guidelines laid down by the Board. Respondents' exhibit E, however, was not shown to the sheriff's representatives at this meeting.

Wellman recalled being asked about the 13.66 percentage difference. He said it was a "theoretical . . . or hypothetical question" by Mr. Thurman as to "where the County [was] in . . . taking the salary difference or differential and applying a ninety percent figure to that differential, then what would the practical results be, according to the County's current rules of rounding?" The discussion on this point, according to Wellman, resulted in his writing the mathematical calculation at the bottom of petitioner's exhibit No. 2.

William Gnass, county counsel, testified to his part in the negotiations. He understood the structural increases would be based on a specified percentage of "the average in the survey area" for each of three years commencing July 1, 1985. He also did not recall any conversations about applying the percentage to the differential between Merced County salary and the nine-county survey. Gnass, however, did recall some questions being asked about the difference "in regard to rounding, the rounding rules, and I know the dialogue went [on] between Mr. Wellman in that regard."

Gnass substantiated Wellman's testimony about their meeting privately with the Board and getting its authority to present the proposal contained in respondents' exhibit E to the Sheriff's Association representatives at the February 17 meeting. "[T]hat's . . . the sole direction, that Mr. Wellman and I—that we were given, . . ." However, Mr. Gnass acknowledged that respondents' exhibit E was not shown to Bennett or Thurman or anyone representing the Sheriff's Association at the February 17 meeting.

Gnass also testified that he reviewed the proposed contract drafted by Bennett "page by page, paragraph by paragraph with Mr. Channing, the CAO, and Mr. Goman [chairman of the Board] . . . went over it pagewise in his office."

Albert Goman, chairman of the Board who signed the final contract on behalf of the County, testified that the Board had authorized Mr. Wellman to negotiate a three-year agreement with the deputies whereby they were to receive a raise based on 90, 95 and 100 percent of the nine-county average salary as specified in respondents' exhibit E. Mr. Goman stated that when the final contract was presented to him by Mr. Gnass he read it and signed it. "Other individual Board members had seen it prior to my signing it also." Mr. Goman understood the contract to "contain terms similar to that listed on [respondents' exhibit E] on the board." Goman, of course, never attended any of the negotiating sessions between the County and the Sheriff's Association.

The extrinsic evidence pertaining to the firefighters' agreement can be summarized as follows. Gnass testified about his last negotiating session with the Firefighters' Association which took place on March 9, 1984, after the dispute had arisen between Bennett and Gnass over the meaning of the Sheriff's Association agreement. On direct examination, Gnass testified that he had added the three extra sentences at the end of paragraph 7d which express the intent that the engineer's salary would approximate a specified percentage (85, 90, 95) "of said Deputy Sheriff II average in the survey area." Gnass told the firefighters the practical effect of the formula, as set forth in paragraph 7d of the firefighters' agreement, "[v]ery carefully." He "explained to them we were talking [about] salary averages." He did this because he had received Bennett's letter and "I wanted to make sure that there was no dispute, that what we were talking about was salary average, wasn't talking about any differential, or anything, but salary averages."

On cross-examination, however, Gnass seemed to contradict his direct testimony. In response to a question as to whether he discussed paragraph 7d with the firefighters, he stated, "I don't recall saying anything about it." Nor did Gnass recall being asked about the purpose of the language which he had added to the firefighters' contract. Gnass did acknowledge that he did not tell the firefighters the nature of the dispute that had arisen with the Sheriff's Association over their contract; he simply told them that he and Mr. Bennett were not getting along. Finally, Gnass acknowledged that "[s]taying five percent behind the Sheriffs was something that was discussed."

Mark Johnson, a firefighter and member of the negotiating team, testified that he was at the March 9 meeting with Mr. Gnass. He said Gnass presented the salary proposal to the firefighters. "[H]e presented what was in the contract as we signed it. We did have a contract before us of the Sheriff's Department, and we reviewed them and compared them, not line-by-line, but we compared it more or less page by page . . . ."

Johnson testified that he asked Mr. Gnass specifically "why there was an additional [*sic*] addition to the [salary] paragraph, compared to the Sheriff's contract." Gnass responded that it "was to make clear to us that we were to stay five percent behind the Sheriff's Deputy [salary]." Johnson also verified that when Gnass was asked about a problem with the Sheriff's Association he responded, ". . . Mr. Bennett and I are having a disagreement." Mr. Gnass gave the firefighters no explanation of the County's salary proposal. "He said, . . . this is it."

## DISCUSSION

### I. *The Sheriff's Association agreement.*

Without mutual assent, there is no contract (Civ. Code, § 1550, subd. 2; *Chakmak* v. *H. J. Lucas Masonry, Inc.* (1976) 55 Cal.App.3d 124, 129 [127 Cal.Rptr. 404]). ■ "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. [Citation.] Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." (*Meyer* v. *Benko* (1976) 55 Cal.App.3d 937, 942-943 [127 Cal.Rptr. 846].) The manifestation of assent to a contractual provision may be "wholly or partly by written or spoken words or by other acts or by failure to act." (Rest.2d Contracts, § 19.)

■ Nevertheless, as expressed in the Restatement Second of Contracts section 20, subdivision (1), "There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and [¶] (a) neither party knows or has reason to know the meaning attached by the other; or [¶] (b) each party knows or each party has reason to know the meaning attached by the other." Under these rules no contract is formed if neither party is at fault or if both parties are equally at fault. (Rest.2d Contracts, § 20, com. d; see also Rest.2d Contracts, § 201.)

■ Conversely, "The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if . . . that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party." (Rest.2d Contracts, § 20, subd. (2)(b); see also Rest.2d Contracts, § 201, subd. (2).) Thus, under this rule, a party may be bound by a negligent manifestation of assent, provided the other party is not negligent. (Rest.2d Contracts, § 20, com. d.)

■ In the present case, the trial court found there was no contract between the County and the Sheriff's Association because the parties each

had a mistaken belief as to the meaning of paragraph 7c even though the representatives of both parties "acted in good faith, based upon a reasonable and justifiable interpretation of Paragraph 7(c)." This finding of good faith is sound since no one argues that the parties subjectively acted otherwise when they negotiated the contract; however, a serious question arises as to whether the County acted reasonably and justifiably in formulating its understanding of the meaning of the language of paragraph 7c. In making our analysis of this issue, we assume that the County is bound by the manifestations of assent as well as the knowledge of its agents Mr. Wellman and Mr. Gnass in the negotiating process.

First, we turn to the pertinent language of paragraph 7: "7. The parties agree that, effective the first pay period following July 1, 1985, July 1, 1986, and July 1, 1987, the wages of employees in the unit represented by Association shall be determined as follows:

"a. The survey shall jointly be conducted by the parties comparing the wages of a Deputy II (top step) in Merced County to the wages of a Deputy II (top step, or comparable classification) in nine (9) designated counties, to wit: the Counties of Butte, Fresno, Humboldt, Madera, San Joaquin, Solano, Stanislaus, Tulare, and Yolo;

"b. In determining the *average top step pay* for said positions, the *percentage differentials* between first step and top step of Deputy II shall be determined, then *averaged*;

"c. Wage increases, if any, shall be those approximating ninety percent (90%) of *said average* (July 1985), ninety-five percent (95%) of said *average* (July 1986), and one hundred percent (100%) of s*aid average* (July 1987), said percentages *to be applied to the actual differential determined by the survey,* then rounded off to the nearest two and one-half percent (2.5%);

". . . . . . . . . . . . . . . . . . .

"e. The increases, if any, to be effective in July of 1985-87 shall be determined, to the greatest extent possible, by March 31, of each of the enumerated years, except that the salaries to be determined by said inquiry shall be those which would be effective on July 1 of each of those years. Should any of the enumerated counties not have reached agreement by July 1 of each of the enumerated years, the parties agree that the salary in effect as of July 1 of that particular year shall be the one to be used in determining the average. In determining the nine county averages as described above, the highest and lowest wage level paid by said counties shall not be used;

"f. It is understood that under no circumstances will the implementation of this provision result in a wage decrease for any employee represented by Association." (Italics added.)

It is obvious that the phrase "said average" as used in the first clause of subparagraph 7c has reference to the "average" determined by the formula provided in subparagraph 7b, but which "average" in subparagraph 7b does it refer to—the "average top step pay" for the nine-county deputy II position or the average of the "percentage differential" between Merced County and the survey salaries? Both concepts are used in subparagraph 7b. The first clause of subparagraph 7c can probably be read in either way. But Mr. Bennett was careful in his drafting—he added a second clause to subparagraph 7c which made clear what he intended: "Said percentages [90, 95 and 100 percent] to be applied to the *actual differential* determined by the survey, . . ." (Italics added.) ██ ██ Thus, the reasonable interpretation of subparagraph 7c is that the salary increases were to be geared to a specified percentage of the *difference* between the average survey salary and the Merced County salary rather than to a percentage of the average survey salary.[1]

Our holding does not mean that the County did not entertain a contrary subjective meaning but, as we have previously explained, the existence of mutual assent is determined by an objective rather than a subjective standard, i.e., what a reasonable person would believe from the outward manifestations of consent. Here, we have a written integrated contract which reasonably can be interpreted as meaning exactly what the Sheriff's Association intended it to mean. Ordinarily, absent fraud or mistake of fact, the outward manifestations or expression of consent in such a contract is controlling, i.e., mutual assent is gathered from the reasonable meaning of words and the acts of the parties, not from their unexpressed intentions or understanding. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 88, p. 92.)

Furthermore, even if we should conclude that the provisions of paragraph 7c are so ambiguous that either party's intended meaning reasonably can be derived from the language used, the contract should nevertheless be enforced according to the meaning asserted by the Sheriff's Association. The guiding

---

[1] It is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) We find no credibility conflict in the extrinsic evidence below. Each party's subjective "understanding" of the meaning of the written contract as well as what was agreed to at the negotiating sessions does not present a credibility question nor does each party's failure to "recall" conversations or statements by the other party at the negotiating sessions raise such a question. Thus, as an appellate court we are required to independently determine the meaning of the contract. (*Id.* at p. 866.)

principle in this situation is articulated in Restatement Second of Contracts, section 20, subdivision (2)(b). "The manifestations of the parties are operative in accordance with the meaning attached to them *by one of the parties* if . . . that party has no reason to know of any different meaning attached by the other, and *the other has reason to know* the meaning attached by the first party." (Italics added; cf. Rest.2d Contracts, § 201, subd. (2) and com. d.) A party may thus be bound by a negligent manifestation of assent if the other party is not equally negligent. (Rest.2d Contracts, § 20, com. d.)

The evidence shows that the County had "reason to know" the meaning intended by the Sheriff's Association. At the last negotiating session on February 17 Deputy Sheriff Thurman asked Mr. Wellman, the County's representative, what the practical effect of the wage increase would be if it went into effect immediately. Wellman responded by calculating the projected raise at the specified percentage (90 percent) of the 13.66 differential in pay between the nine-county average and the Merced average as shown by petitioners' exhibit No. 2. Wellman's handwritten notes on petitioners' exhibit No. 2 corroborate Thurman's testimony. Wellman's attempted explanation that the calculations were intended only to illustrate the County's "rounding [off] process" is not convincing; it does not explain his application of the 90 percent standard to the 13.66 differential. At the very least, Wellman's conduct reasonably should be deemed to have placed the County on notice of the intended meaning of the Sheriff's Association, i.e., that the pay raise was to be based on the percentage difference between the Merced County deputies' salaries and the average survey salary.

Further, Mr. Bennett's insertion of the second clause in paragraph 7c— "said percentages to be applied to the *actual differential* determined by the survey, . . ." (italics added) should have put Mr. Gnass, the county counsel, as well as Mr. Wellman, on notice of the meaning intended by the Sheriff's Association. If Mr. Gnass had read the contract carefully, he would have realized that the Sheriff's Association had a different understanding of the pay raise than did Gnass and Wellman. Thus, the County through its negotiating agents had ample reason to know of the intended meaning of the Sheriff's Association.

The next question is whether the Sheriff's Association had reason to know the meaning attached to paragraph 7c by the County. If the Sheriff's Association had reason to know of the County's interpretation, then the Sheriff's Association would be deemed to be equally negligent with the County in misinterpreting paragraph 7c, and the result would be no contract. (Rest.2d Contracts, § 20, subd. (1).) We find no evidence to support a finding that the Sheriff's Association was negligent in negotiating the contract with the County. The County's argument that the deputies could not reasonably have

believed their asserted meaning because the deputies understood they would not achieve parity the first year and that conceivably under their interpretation parity could be achieved the first year because of the process of rounding off to the nearest 2½ percent is not convincing. The fact that under some conceivable hypothesis the deputies could achieve parity the first year does not foreclose a reasonable belief by the deputies that "pragmatically" they were to receive a pay increase based on a percentage of the salary differential.

Also the County's argument that subparagraph f of paragraph 7, which prohibits *decreases* in salaries during the term of the contract, would be redundant if the deputies' interpretation were accepted—hence, the deputies could not have intended their interpretation—does not wash. Paragraph 7f can be viewed simply as an expression of a bargain already made, i.e., no wage decreases during the three-year salary adjustment period. In short, the redundancy of paragraph 7f does not foreclose the reasonableness of the deputies' understanding of the meaning of paragraph 7c.

We conclude, therefore, that subparagraph 7c should be interpreted to mean that the percentages apply to the differential between the nine-county average and the Merced County salaries, the interpretation espoused by the Sheriff's Association.

II. *Firefighters' MOU.*

Subparagraph 7d of the Firefighters agreement reads as follows: "Wage increases, if any, shall be those approximating eighty-five percent (85%) of said average (July 1985), ninety percent (90%) of said average (July 1986), and ninety-five percent (95%) of said average (July 1987), *said percentages to be applied to the actual differential determined by the survey,* then rounded off to the nearest two and one half percent (2.5%). It is the intent of the parties that as of July 1, 1985, that the Engineers' salary range will approximate eighty-five percent (85%) of said *Deputy Sheriff II average in the survey area.* It is intent of the parties that as of July 1, 1986, the Engineers' salary range will approximate ninety percent (90%) of said *Deputy Sheriff II average in the survey area.* It is intent of the parties that as of July 1, 1987, that the Engineers' salary range will approximate ninety-five percent (95%) of said *Deputy Sheriff II average in the survey area.*" (Italics added.)

■ The first sentence of paragraph 7d other than the specified percentages is identical to the language in paragraph 7c of the Sheriff's Association agreement. As we have explained, this sentence means that the percentages shall be applied to the difference between the survey salaries and the Merced County deputy II salary. However, Mr. Gnass added to the firefighters' contract the three additional sentences found in paragraph 7d. According

to Gnass, he did this to make sure the firefighters understood that they were talking about salary averages and not salary differential. Gnass testified on direct examination that he carefully explained this point to the firefighters at the March 9, 1984, negotiating session before the contract was signed. This additional language, of course, makes paragraph 7d ambiguous on its face —the addition directly contradicts the clear meaning of the first sentence of the paragraph.

As we have already explained, Mr. Gnass seems to contradict himself on cross-examination. He was unable to recall the specifics of any discussion at the March 9 meeting about his addition to paragraph 7d, he did not recall being asked by anyone about the purpose of the additional language, he did not disclose to the firefighters the substance of the County's dispute with the Sheriff's Association over the meaning of the language incorporated in the first sentence of paragraph 7d but he did acknowledge some discussion about the firefighters' remaining 5 percent behind the deputies in the salary adjustment formula.

Mark Johnson, the firefighters' representative, testified that he specifically asked Mr. Gnass at the March 9 meeting why there was an addition to their contract as compared with the Sheriff's Association contract, and Gnass only responded that it was "to make clear to us that we were to stay five percent behind the sheriff's deputy."

It should be emphasized at this point that the trial court did not rely on the testimony of either Gnass or Johnson in reaching its decision on the firefighters' contract. Rather, the trial court looked only to the terms of the written contract and found "there is no ambiguity in the language . . . of the contract;" it is "clear and unambiguous" and ordered it enforced "in accordance with its express terms."

We respectfully disagree with the trial court's holding that the language of paragraph 7d of the firefighters' contract is unambiguous. The language added by Gnass to the formula derived from the Sheriff's Association contract directly conflicts with the Sheriff's Association's formula and renders the entire paragraph 7d contradictory on its face.

Examining the extrinsic evidence as to what was said at the March 9 meeting sheds little, if any, light on the meaning of paragraph 7d. Gnass obviously intended by the additional language to make clear that any salary increase would be based on a percentage of the survey salaries rather than any differential. But what did the firefighters reasonably understand the language of paragraph 7d to mean?—they do not recall any discussion about

the formula other than that it would keep them 5 percent behind the deputies. Gnass acknowledges this was discussed.

If the sheriff's deputies are to get a percentage raise based on the differential in pay with the nine-county average but the firefighters are to get a percentage raise based only on the survey average, then it is quite apparent that the firefighters would receive far *less* than 5 percent below the sheriff's deputies, at least during the first and second years. This obviously was not contemplated by the parties.

We defy any rational person to make sense of the language contained in paragraph 7d of the firefighters' contract. This is particularly so in light of our determination of the meaning of the language contained in paragraph 7c of the Sheriff's Association contract which becomes tangentially relevant in determining the meaning of the firefighters' paragraph 7d because of the uncontradicted testimony that the firefighters were to stay within 5 percent of the deputies' salaries.

"There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and [¶] (a) neither party knows or has reason to know the meaning attached by the other; or [¶] (b) each knows or each party has reason to know the meaning attached by the other." (Rest.2d Contracts, § 20; see also *Rovegno* v. *Defferari* (1871) 40 Cal. 459, 462-463.) The basic principle governing material misunderstanding is thus: no contract is formed if neither party is at fault or if both parties are equally at fault. We conclude that both parties are at fault in their understanding of the meaning of the firefighters' agreement. The County, by Mr. Gnass, improperly advised the firefighters that the purpose of the language added to paragraph 7d was to insure that the firefighters would remain 5 percent below the deputies' salary. The firefighters were equally at fault in light of Mr. Gnass's testimony that he told them their percentages would apply to the survey salaries and not to a differential between salaries, and the firefighters' failure to appreciate the import of the words added to paragraph 7d by Mr. Gnass. In short, the County and the firefighters were so intent on their own subjective understanding of the meaning of paragraph 7d that they passed each other like two ships on a stormy sea—neither aware of the other's presence insofar as understanding the other's intended meaning of the contract. We therefore have no alternative but to declare that the parties failed to reach a meeting of the minds; there was no objective manifestation of assent, and the parties will have to renegotiate the salary increase.

The judgment is reversed. The trial court is ordered to issue a writ of mandate directing the County to follow the contract with the Sheriff's Associ-

ation according to the interpretation espoused by the Sheriff's Association and to direct the parties to renegotiate paragraph 7d of the Firefighters' Association. In all other respects, the judgment is affirmed. The Sheriff's Association and the Firefighters' Association to recover their respective costs on appeal.

Hamlin, J., and Ballantyne, J., concurred.

A petition for a rehearing was denied February 2, 1987, and the petition of defendants and appellants for review by the Supreme Court was denied March 25, 1987.