**NETBULA, LLC, Plaintiff,**

**v.**

**BINDVIEW DEVELOPMENT CORPORATION et al., Defendant.**

**No. C06–00711 MJJ.**

United States District Court, N.D. California.

Sept. 10, 2007.

Vonnah Brillet, The Law Office of Vonnah M. Brillet, San Leandro, CA, Gary Scott Fergus, Fergus, A Law Firm, San Francisco, CA, for Plaintiff.

Albert L. Sieber, David M. Lacy Kusters, Jedediah Wakefield, Laurence F. Pulgram, Liwen Arius Mah, Fenwick & West LLP, San Francisco, CA, Mary Elizabeth Milionis, Fenwick & West LLP, Mountain View, CA, for Defendant.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO COPYRIGHT INFRINGEMENT; GRANTING DEFENDANT PULASKI'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT BINDVIEW'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S BREACH OF CONTRACT AND FRAUD CAUSES OF ACTION; AND DENYING PLAINTIFF NEBULA'S CROSS–MOTION FOR SUMMARY JUDGMENT AS TO COPYRIGHT INFRINGEMENT

MARTIN J. JENKINS, District Judge.

### INTRODUCTION

Before the Court are: (1) Defendants BindView Development Corporation ("BindView"), Symantec Corporation ("Symantec"), and Eric J. Pulaski's ("Pulaski")(collectively, "Defendants") Motion for Summary Judgment as to Copyright Infringement[1]; (2) Defendant Pulaski's Motion for Summary Judgment as to Fraud and Copyright Infringement[2]; and (3) Defendant BindView Motion for Summary Judgment as to Breach of Contract and Fraud.[3] Plaintiff Netbula, LLC ("Netbula") opposes each of Defendants' motions. Also before the Court is Plaintiff Netbula's Cross–Motion for Summary Judgment as to Copyright Infringement.[4] Defendants oppose Plaintiff's cross-motion. For the following reasons, the Court:

(1) **GRANTS** Defendants' Motion for Summary Judgment as to Copyright Infringement;

(2) **GRANTS** Defendant Pulaski's Motion for Summary Judgment;

(3) **GRANTS** Defendant BindView's Motion for Summary Judgment as to Plaintiff's Breach of Contract and Fraud Causes of Action; and

(4) **DENIES** Plaintiff Netbula's Cross–Motion for Summary Judgment as to Copyright Infringement.

### FACTUAL BACKGROUND

The current action arises from a dispute concerning Defendants' use and distribution of certain computer software code belonging Plaintiff. Unless otherwise noted, the Court finds the following facts to be undisputed for purposes of the pending motions.

#### A. Overview of the Dispute

While conducting due diligence in connection with its acquisition of BindView, Symantec discovered software possibly belonging to Netbula in a BindView software product called, bv-Control for Internet Security ("bv-CIS"). (Joint Statement of Undisputed Fact ("JSUF") ¶ 16.) BindView had previously acquired Netect Corporation ("Netect"), whose sole product was HackerShield. (*Id.* at ¶¶ 11, 13.) After its acquisition of Netect, BindView continued to develop HackerShield and sold the product as bv-CIS. (*Id.* at ¶ 16.) After the parties failed to informally resolve the matter, Plaintiff asserted claims for: (1) copyright infringement under 17 U.S.C. § 101 *et seq.* against all Defendants arising from Defendants alleged unauthorized copying of Plaintiff's software; (2) intentional fraud under California Civil Code Section 1709 against all Defendants arising from Defendants' act of providing a false and incomplete software usage reports, and for falsely promising to provide complete accurate software usage information; (3) breach of contract under California law against Symantec and BindView arising

---

**1.** Docket No. 224.

**2.** Docket No. 231.

**3.** Docket No. 215.

**4.** Docket No. 234.

from an alleged breach of an oral settlement agreement, and from BindView's failure to provide a complete software usage report as promised; and (4) statutory unfair competition under California Business and Professions Code § 17200 *et seq.* against all Defendants.

## B. The Parties

Netbula was formed in July 1996. (JSUF at ¶ 1.) Mr. Dongxiao Yue ("Yue") is the owner and only employee of Netbula. (*Id.*) Netbula's ONC RPC and Power RPC software facilitates the use of "Remote Procedure Call" or "RPC" technology. (*Id.* at ¶ 2.) RPC allows a program on a local computer to execute a command on a remote computer over a network. (*Id.*) Yue developed Netbula ONC RPC and Netbula PowerRPC beginning in 1994. (*Id.*) Netbula offers software developer kit ("SDK") licenses for computer programmers who will use the SDK to develop applications and distribution licenses that give the licensee the right to distribute Netbula RPC supporting programs and components. (*Id.* at ¶ 4.) Throughout the history of Netbula, it only executed a few signed license agreements with its customers. (*Id.* at ¶ 5.) During the relevant time period of 1998–1999, Netbula's customers could purchase licenses for Netbula RPC SDK and distribution licenses by submitting requests over the internet, by fax, or by calling Yue. (*Id.*) Netbula would then deliver software to customers by floppy disk, e-mail or download. (*Id.*)

Netect was incorporated in July 1996 under the laws of Israel. (*Id.* at ¶ 7.) Netect developed a software product called HackerShield, which was Netect's only product. (*Id.* at ¶ 11.) In July 1998, Netect purchased one user *development license* for Netbula ONC RPC SDK and one *distribution license* for Netbula's runtime library. (*Id.* at ¶ 7.) The parties have been unable to locate or produce an actual written copy of the 1998 Netect license agreement. (*Id.*) In addition, Yue has no recollection of the event of Netect's acquisition of licenses. (*Id.* at ¶ 6.) Likewise, Defendants have no documentation of the event of Netect's acquisition of licenses. (*Id.*)

BindView is a Texas corporation founded by Mr. Eric J. Pulaski ("Pulaski") in May 1990. (*Id.* at ¶ 12.) In March 1999, BindView acquired Netect by a share purchase, purchasing all outstanding equity interests in Netect with BindView Common Stock. (*Id.* at ¶ 13.) The Share Purchase Agreement specified that it "will be governed by the laws of the State of Texas without regard to conflicts of laws principles." (*Id.*) BindView continued to develop and sell Netect's HackerShield after its acquisition of Netect, and sold the product as bv-CIS. (*Id.* at ¶ 15.)

In September of 2005, Symantec was conducting due diligence in connection with Symantec's acquisition of BindView and discovered software possibly belonging to Netbula in bv-CIS. (*Id.* at ¶ 16.) BindView could not locate a Netbula license agreement in its records. (*Id.* at ¶ 17.) Accordingly, on September 28, 2005, Mr. David Gayler ("Gayler") of BindView sent an email to Netbula regarding the purchase of the necessary licenses, if any, with a subject line "need to purchase ASAP". (*Id.*) As set out more fully below, between September and November 2005 the parties continued to communicate regarding the scope of the 1998 Netect license, however were unable to reach an agreement on the terms of the 1998 Netect license. (*Id.* at ¶¶ 19–53.)

## C. The Parties' Subsequent Licensing Communications

The parties' subsequent licensing communications are largely contested. However, a chronological summary of the undisputed communications is as follows.

On September 29, 2005, Yue responded to Gayler's e-mail by providing a copy of

what Yue identified as Netbula's then-current license agreement template. (*Id.* at ¶ 18.) Gayler asked Yue to check and see if he had any records under a company named Netect. (*Id.* at ¶ 19.) Yue informed Gayler that, "I found it in our customer database. It was purchased in July 1998. One limited client distribution license for Windows NT/95 and one ONC RPC developer license for NT/95. But I couldn't find other details." (*Id.* at ¶ 20.)

On October 2, 2005, Symantec and Bind-View signed a merger agreement, and BindView also provided Symantec with a disclosure letter. (*Id.* at ¶ 20; Brillet Decl. Ex. B, BV00691.) Subsequently, Yue began demanding software royalty reports from BindView regarding its use of Netbula's software. On October 3, 2005, Yue sent an e-mail to Gayler stating that he noticed Symantec was acquiring Bind-View and asked for a royalty report "on the Netbula RPC usage ASAP." (*Id.* at ¶ 22.) On October 10, 2005, Yue sent a letter to Pulaski, asking BindView to provide a royalty report by October 29, 2005 containing the following information: (1)

date of deployment; (2) platform type; (3) Netbula RPC runtime usage type; and (4) the number of machines onto which Netbula RPC runtime component was copied. (*Id.* at ¶ 24.)[5] Yue then sent another letter on October 13, 2005 to Pulaski stating "we have the following concerns with royalty reports," listing several concerns, including "[w]hether a sale was made for multiple or even unlimited licenses." (*Id.* at ¶ 26.) Yue wrote that "Netbula RPC license are counted by the number of machines" and asked BindView to provide additional information. (*Id.*)

On or about October 15, 2005, Mr. Jeff Margolis ("Margolis"), Senior Vice President of BindView, telephoned Yue and informed Yue that BindView would provide a report before the October 29, 2005 deadline set by Netbula. (*Id.* at ¶ 27.) On October 18, 2005, Yue sent Margolis another e-mail stating that Yue presumed that the relevant BindView product at issue was "bv-Control." (*Id.*)[6]

On October 25, 2005, Margolis of Bind-View sent an e-mail to Yue containing the following software usage chart:

| | 2005 (1H) | 2004 | 2003 | 2,002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|
| Units | 78 | 248 | 145 | 123 | 107 | 437 | 559 |
| Total 1999 - 2005 (1H) | 1,881 | | | | | | |
| July 1998 Purchase | 1,000 | | | | | | |
| Net | 881 | | | | | | |

(*Id.* at ¶ 30.) BindView advised Plaintiff that it would need approximately 680 additional licenses to accommodate any overrun beyond the 1,000 Plaintiff believed were originally purchased, and that Bind-

View would be willing to simply buy another thousand-pack. (*Id.*) On the same day, Yue sent an e-mail to Margolis objecting that the chart that had been sent did not

5. On about October 11, 2005, Yue mailed a copyright application for PowerRPC and a check for the $30 application fee to the Copyright Office. (*Id.* at ¶ 25.) Plaintiff was granted a copyright TX6–211–063 bearing an effective date of registration of October 18, 2005 for the 1996 version of software with the

Copyright Title of Netbula Power RPC. (*Id.* at ¶ 29.)

6. On October 17, 2005, BindView filed a preliminary proxy statement with the SEC. (*Id.* at ¶ 28; Pulaski Decl., Exh. 19.)

reflect "site licenses." (*Id.* at ¶ 31.) Yue threatened to file a lawsuit against Bind-View unless Netbula received the requested information by October 29, 2005. (*Id.*) Yue further indicated that Symantec should be notified about the situation, since it was acquiring BindView's intellectual property. (*Id.*)

On the afternoon of October 26, 2005, Mr. D.C. Toed ("Toed"), BindView's general counsel, sent an e-mail to Yue. (*Id.* at ¶ 32.) Toedt wrote: "Even erring much on the side of generosity, our rough estimate is that Netbula's monetary recovery would amount, to about $24,000." (*Id.* at ¶ 32.) Toedt also wrote: "Please confirm which way Netbula wants to proceed with this matter—as a litigation matter, or on a business basis as described above. If the latter, BindView will provide you with the information you requested, to the extent practicable, once we have put an NDA in place." (*Id.*) Finally, Mr. Toedt wrote: "we hope you were not hinting that Netbula might try to tortiously interfere with the merger agreement." (*Id.*)

On November 2, 2005, Yue sent a letter to Pulaski, BindView's CEO, with a copy addressed to Mr. John Thompson ("Thompson"), CEO of Symantec, stating that Netbula had concluded that Bind-View's October 25, 2005 report was untrue and that BindView had issued site licenses that were not identified in the original report. (*Id.* at ¶ 36.) The next day, on November 3, 2005, BindView filed its quarterly report with the SEC. (*Id.* at ¶ 37.)

On November 7, 2005, Pulaski telephoned Yue at Netbula. (*Id.* at ¶ 38.) Toedt claims he was with Pulaski and claims that he took notes of the telephone conversation. (*Id.*) Plaintiff claims that Toedt did not announce his presence during the call. Toedt's notes read, among other things, (1) Pulaski told Yue: "We want to reach a reasonable solution—pay the full amount we owed you"; (2) on the

issue of site licenses, Toedt's notes read: "Eric summary: We'll check on site licenses—work out some kind of average # of admins"; (3) on pricing: Toedt's notes read "99–$50 for runtime license", "pre-pay—different price"; (4) on evaluation downloads: "Evals: that's a lot harder" "We'll see what we can do w/ download reports." (*Id.*) During the November 7 call, Pulaski did not agree that downloaded evaluation copies should be counted in determining a settlement amount. (*Id.*)

After the November 7, 2005 call, Yue sent an e-mail to Toedt in which he stated:

"Eric Pulaski, CEO of BindView called me and we talked for about 45 minutes on the phone. (*Id.* at ¶ 39.) Eric said he would address the questions we raised, including site licenses, free downloads, give aways, developer licenses (the product development have been moved from places to places, now it's in India), and would provide supporting data for the number of copies. I took the definition of copy as moving the copyrighted material from permanent storage to computer memory. Eric told me that it was Symantec discovered the PowerRPC license issue by running some audit software. Eric admitted that programmers must have known about the use of PowerRPC, but the info never got propagated to management. Mr. Margolis told me before that bv-Admin was selling better than bv-Control (which we found to be untrue), Eric corrected that. Netbula is extremely disturbed by the fact that there was a way for people to get a copy of a fully functional pwrpc32.dll runtime library off the web. As we discussed, there are two approaches to resolve this dispute. One is for BindView to provide a complete, accurate and verifiable usage report, then we move to a phase of computing fees and interests. In my first two letters to BindView, I was talking

about the first approach. The other way is to go through the Court. Netbula won't sleep on its rights. If we will have to fight Symantec as Eric indicated to me, we will make the charge. In fact, Netbula is dealing with a multi-billion dollar company on very similar issues— but they are far more cooperative—they provide order line item info without any hassle. I will be out of town for a couple of days. Mr. Toedt, please let Eric know in case he wants to contact me directly. I have Neil briefed on the newest development, and BindView can contact Neil on the case matter. Regards, Don."

(*Id.* at ¶ 39.)

The next day, on November 8, 2005, BindView filed a definitive proxy statement with the SEC attaching the merger agreement but not the disclosure schedules. (*Id.* at ¶ 40; Pulaski Decl., Exh. 20.)

On November 11, 2005, Toedt sent an e-mail to Yue, stating that: (1) BindView compiled a list of downloads; and (2) BindView was pulling together site license information. (*Id.* at ¶ 42.) Toedt indicated that BindView hoped to be able to provide a reasonably complete report the next week. (*Id.*) On November 12, 2005, in an e-mail to various BindView representatives, Yue expressed a "renewed hope that we can resolve this dispute in a fair and good faithed [sic] manner without going to Court." (*Id.*)

On November 17, 2005, Yue wrote to Pulaski that "Netbula certainly hope [sic] that Symantec will continue to use PowerRPC." (*Id.* at 44.) On November 18, 2005, Pulaski advised Yue that BindView was in the process of removing the call to Netbula's PowerRPC library from its bv-CIS product because it had not been able to resolve the royalty issue with Netbula. (*Id.*; Pulaski Dec. ¶ 26, Ex. 11.) Yue wrote back the same day, expressing his anticipation of the royalty report and stat-

ing that: "Once we have the report, it will be a major step towards resolving the license issue with PowerRPC." (*Id.*)

On November 21, 2005, Toedt e-mailed Yue a summary of HackerShield/bv–CIS licenses granted by BindView and supporting details. (*Id.* at ¶ 46.) The report indicated 54 site licenses were issued, with 1627 non-site licenses. (*Id.*) The e-mail also attached a list of downloads from December 2000 to August 2005. (*Id.*) Yue responded the same day by email stating:

> D.C. and Eric, Thanks for the report. We now see where the 1681 came from. I looked at the download records, it did not show anything prior to Dec 2000. Do you have any records on that? (see http://www.nmrc.org/pub/advise/ 19990910.txt) As for the site licenses, we need to assess the number of copies. My suggestion is to take the numbers of employees of the customer companies and divide it by a factor of 12. Eric's assistant just called and set up a call at 2:00 PM central time Nov 23, 2005. Regards, Don

(*Id.*) BindView did not accept Yue's suggestion on how to compute the number of copies. (*Id.*)

On November 23, 2005, Yue telephoned Pulaski. (*Id.* at ¶ 49.) Toedt claims he took notes during the November 23, 2005 call, and claims those notes for the call were one page in length. (*Id.*) Pulaski said BindView should not have to pay royalties for downloads and evaluation copies and Yue disagreed. (*Id.*) However, during the call, Pulaski offered to settle the parties' dispute for $50,000, and told Yue to "take the money and run" or he would end up in court with Symantec for years. (*Id.* at ¶ 50.) Yue did not accept the settlement offer, and the parties concluded that further direct talk would not be productive. (*Id.*)

Following the November 23, 2005 conversation, Yue sent another e-mail to Toedt purporting to summarize his conversation with Pulaski. (*Id.* at ¶ 51.) Toedt responded, and added, "This e-mail isn't intended as a complete factual response to your summary of your conversation with Eric." (*Id.*) Yue wrote on November 25, 2005 that he believed that Bindview's first report on October 25, 2005 "was an act, expression, omission and concealment calculated to deceive Netbula" as to which he might "take actions base on relevant state laws." (*Id.* at ¶ 52.)

On January 6, 2006, Symantec acquired BindView through a reverse triangular merger, by which Symantec created a wholly-owned corporation, Buena Vista Acquisition Corp., to effect a reverse merger with BindView, leaving BindView as the surviving company as a wholly owned subsidiary of Symantec. (*Id.* at ¶ 54.) The Plan of Merger specified that the Texas Business Corporations Act ("TCBA") would govern the effects of the merger. (*Id.*) On January 6, 2006, Symantec announced the completion of its merger with BindView. (*Id.*)

**D. The 1998 Netect Licensing Agreement**

Although Netbula's customers could purchase licenses by submitting requests over the internet, by fax, or by calling Yue—at which point Netbula then delivered software to customers by floppy disk, e-mail or download—the parties have found no records of the 1998 software license agreement between Netbula and Netect. (*Id.* at ¶¶ 5, 8.) To the extent the parties may have completed the licensing agreement and terms over the internet, there are no known copies of Plaintiff's website as it existed during the relevant time frame in 1998. (*Id.* at ¶ 9.) Similarly, there are no known copies of communications between Netect and Netbula in 1998. (*Id.*)

As best the Court can discern from the parties stipulation of undisputed fact, the only evidence of a Netbula/Netect Licensing Agreement is as follows. Netbula has found two backup copies of software that include the name "Netect" in the software. (*Id.* at ¶ 8) Netbula has also found two references to Netect in Boston on what it claims is a customer list for Netbula RPC software. (*Id.*) There also exists a match between a backup copy of the software at issue in Netbula's possession containing the name "Netect" and the software used in Bindview's HackerShield and bv-CIS product. (*Id.* at ¶ 9.) However, unlike other Netbula backup copies of software, these files do not include Plaintiff's form license agreement or any license agreement. (*Id.*) Next, a file formerly distributed with BindView's HackerShield and bv-CIS product contains a reference to "Netect LTD. Dev License, Non–Distributable" along with pages of other text (including error messages such as "corrupted software" and "out of memory," and unintelligible characters). (*Id.* at ¶ 10.) This text was not visible in the ordinary use of the program, and to see it, a user would have to view the executable code with a text editor or notepad. (*Id.*) Finally, the code for Netbula's rpcgen.exe file contains the text "Netect LTD. One user ONC RPC Dev License." (*Id.*) However, the rpcgen.exe file was not distributed with the bv-CIS product. (*Id.*)

**E. The Current Action**

On September 1, 2006, Plaintiff filed the operative Complaint asserting claims for: (1) copyright infringement under 17 U.S.C. § 101 *et seq.* against all Defendants arising from Defendants alleged unauthorized copying of Plaintiff's software; (2) intentional fraud under California Civil Code Section 1709 against all Defendants arising from Defendants' act of providing a false and incomplete software usage reports,

from Pulaski's November 7, 2005 false promise to provide complete accurate usage information, and from BindView's November 8, 2005 proxy statement; (3) breach of contract under California law against Symantec and BindView arising from an alleged breach of an alleged oral settlement agreement reached during a November 7, 2005 telephone conference, and from their failure to provide a complete software usage report as promised; and (4) statutory unfair competition under California Business and Professions Code § 17200 *et seq.* against all Defendants. Plaintiff seeks damages, equitable accounting, and the imposition of a constructive trust.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. Once the mov-

ing party has shifted the burden, the party opposing summary judgment must direct the court's attention to specific triable facts, because the court is not required to mine the record for triable issues of material fact. *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1031 (9th Cir.2001); *Butler v. Clarendon America Ins. Co.,* 494 F.Supp.2d 1112, 1125 (N.D.Cal.2007).

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor. *Id.* However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (internal citations omitted).

## ANALYSIS

### A. Defendants' Motion for Summary Judgment—Copyright Infringement Claim

Defendants argue that Plaintiff's copyright infringement claim incorrectly presumes that Defendants had no rights to continue distributing the software after BindView acquired Netect in 1999. According to Defendants, the copyright claim fails because it is based on the false premise that BindView's acquisition of Netect constituted an unlawful assignment of the 1998 Netect license. Defendants contend that because BindView's acquisition of Netect did not constitute an assignment under the applicable state law, and because Plaintiff has adduced no evidence estab-

lishing that the 1998 Netect license was non-assignable or that Defendants otherwise exceeded the scope of the license, there can be no liability for copyright infringement.

Plaintiff disagrees. Plaintiff argues that because the existence of the 1998 Netect license is not in dispute, the burden is on Defendants to establish that their use of Plaintiff's software was authorized and not beyond the scope of that license. Plaintiff also contends that federal copyright law preempts state law on the question of whether there was an assignment of the 1998 Netect license. According to Plaintiff, a transfer of rights is no less a transfer just because it occurs by operation of law in a corporate merger.

### 1. Whether Symantec's and BindView's Succession to Netect's 1998 License Constituted an Assignment or Transfer of Rights.

The threshold question of whether the BindView–Netect and Symantec–BindView mergers resulted in an impermissible transfer of rights in violation of the 1998 Netect license agreement raises choice of law issues. Defendants' position focuses on the state law that governed the two mergers. Defendants presume that because Texas law governed both the BindView–Netect and Symantec–BindView reverse-triangular mergers, and because under Texas law, such mergers do not constitute a transfer or assignment of the company's assets or license rights, there was no unlawful transfer or assignment in this action. On the other hand, Plaintiff's position focuses on federal copyright law. Plaintiff points to the general principle that federal copyright law provides a bright line prohibition against transfer of copyright license rights. *See e.g. SQL Solutions v. Oracle Corp.*, No. C–91–1079 MHP, 1991 WL 626458 at *5 (N.D.Cal. Dec. 18, 1991). To an extend, both parties are generally correct. *Cin-*

*com Systems, Inc. v. Novelis Corp.*, No. 1:05cv152, 2007 WL 128999 at *2 (S.D.Ohio Jan. 12, 2007).

Plaintiff is correct that federal law governs the assignability of licenses. *PPG Indus., Inc., v. Guardian Indus. Corp.*, 597 F.2d 1090, 1093 (6th Cir.1979); *SQL Solutions*, 1991 WL 626458 at *5. "It has long been held by federal courts that agreements granting patent licenses are personal and not assignable unless expressly made so." *PPG Indus., Inc.*, 597 F.2d at 1093. However, Defendants are correct that the question of whether a license has in fact been assigned depends on contract interpretation and, accordingly, is a matter controlled by state law. *See, e.g., SQL Solutions*, 1991 WL 626458 at *3–*4; *Cincom Systems, Inc.*, 2007 WL 128999 at *2 (citing *Johnson v. Jones*, 885 F.Supp. 1008, 1013 n. 9 (E.D.Mich.1995) ("[C]ontract interpretation, which is normally the province of state courts and state law, can become a federal copyright issue"); *Encore Entm't, LLC v. KIDdesigns, Inc.*, 2005 WL 2249897 (M.D.Tenn. 2005) (considering the scope of certain licenses to use copyrighted work and noting that "[w]hile the court relies on state law to provide the canons of contractual construction, such laws are relied upon only to the extent that they do not interfere with federal copyright law or policy" (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir.1989)))). Accordingly, the Court agrees that the question of whether the Defendants breached the 1998 Netect license is a matter of state contract law. However, federalism principles dictate that state rules of contractual construction cannot interfere with federal law or policy. *SQL Solutions*, 1991 WL 626458 at *3. In particular, state law must be applied in a manner that does not conflict with federal copyright law and policy. *S.O.S., Inc.*, 886 F.2d at 1088.

■ Next, in turning to state contract law as means to determine whether a transfer or assignment has occurred, the Court must next decide which state's law to apply. In the current case there are two state law possibilities—the state law governing the original 1998 Netect license agreement or the state law governing the two merger agreements. Although there are few cases on point, the weight of authority, as set forth below, counsels this Court to apply the state law governing the original license agreement rather than the state law that governs the merger agreement.

In *SQL*, Sybase, a competitor of Oracle, had acquired SQL Solutions, an Oracle licensee who had agreed that its rights "were not to be assigned or transferred to a third party without the prior written permission of Oracle." *SQL*, 1991 WL 626458 at *2. To determine if the merged entity succeeded to the license, Judge Patel began with the "threshold question" of "whether a transfer of rights occurred through the reorganization" under state law. *Id.* at *3. There, the court turned to the law governing the original license agreement—and not the law governing the subsequent merger agreement—to determine whether a transfer of rights had occurred. *Id.* at *3–*4 ("In the [license] Agreement, the parties explicitly provided that its interpretation would be governed by California state laws."). Because California law governed the original license agreement, and because "California courts have consistently recognized that an assignment or transfer of rights does occur through a change in the legal form of ownership of a business," the court concluded that a transfer of rights had occurred in violation of the federal copyright law "bright line prohibition against trans-

fer of copyright license rights." *Id.* at *4–*6.

Similarly, in *Cincom*, the court turned to the law governing the original license agreement—and not the law governing the subsequent merger agreement—to determine whether a transfer of rights had occurred. *Cincom*, 2007 WL 128999 at *2. There, Ohio law governed both the license agreement and the merger agreement. *Id.* However, in reasoning why Ohio law applied to the transfer analysis, the court specifically referenced the license agreement. *Id.* The court stated, "[t]he Court agrees that the question of whether the Defendants breached the License Agreement's non-transfer provision is a matter of contract law. However, the Court must apply Ohio law on this issue in a manner that does not conflict with federal copyright law and policy." *Id.* [7]

Finally, although cited the both parties, *PPG* provides little guidance on the choice of law question. *See Cincom*, 2007 WL 128999 at *2, n. 6 (citing *PPG Industries*, 597 F.2d at 1095–96). In *PPG*, Guardian, which competed with PPG, acquired Permaglass, a cross-licensee of PPG's patents. *Id.* at 1091–92. There, the Sixth Circuit first turned to the terms of the original license agreement. *Id.* at 1094–95. The court noted that the license was expressly personal and non-assignable and contained a change in control clause causing termination if, as occurred, a competitor came into ownership of the licensee's stock. *Id.* at 1092. Accordingly, under federal law it was non-assignable. *Id.* at 1094–95. Although not apparently central to the court's holding, the court also corrected the district court's interpretation of the Ohio state law on mergers. *Id.* at 1095–96. In doing so, the court applied a pre-

---

**7.** The court also recognized that Defendants were correct to the extent they argued that "Ohio law should apply pursuant to the License Agreement's choice of law provision." *Id.* at *2.

amendment Ohio statute, which provided that upon merger "all property of a constituent corporation shall be 'deemed to be Transferred to and vested in the surviving or new corporation, without further act or deed.' " *Id.* at 1096. The court noted that the merger agreement also provided that all property " 'shall be deemed transferred to and shall vest in' " the successor. *Id.* The court held that "[t]his indicates that the transfer is by operation of law, not that there is no transfer of assets in a merger situation." *Id.* Because PPG rested its decision on the interpretation of the license agreement and the application of federal copyright law, it provides little guidance to the current question of which state's contract law applies.

Accordingly, because the weight of authority counsels this Court to apply the state law that governs the original license agreement, rather than the state law that governs the merger agreement, the Court finds Defendants' use of Texas law to be unpersuasive. The fact that Texas law governed both the BindView–Netect and Symantec–BindView reverse-triangular mergers, and that under Texas law, such mergers would not constitute a sale, transfer or assignment of the company's assets or license rights, is of no moment on the this factual record. The crucial inquiry is whether the law governing the 1998 Netect license agreement would consider the BindView–Netect and Symantec–BindView reverse triangular mergers to constitute a transfer or assignment of Netect's assets or license rights. However, because the parties have been unable to locate a copy of the 1998 Netect license agreement, the Court is unable to address the issue.

■ Because the terms and choice of law provision of the 1998 Netect license are absent from the current factual record, Plaintiff is unable to establish that the BindView–Netect and Symantec–BindView reverse triangular mergers constituted an impermissible sale, transfer or assignment of Netect's assets or rights. Defendants, as the moving party, have carried their initial burden on summary judgment by showing that Plaintiff lacks sufficient evidence to carry this burden of persuasion at trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir.2000). Here, by showing that Plaintiff does not have evidence from which a jury could find an essential element of the copyright infringement claim—namely that an unlawful transfer or assignment occurred—summary judgment in Defendants' favor is appropriate on this portion of the copyright infringement claim.

## 2. The Scope of the 1998 Netect License Agreement

■ Next, Defendants argue that where, as here, the existence of a license agreement is not in dispute, and the scope of the license is the only issue, the copyright owner bears the burden of proving that the copying was unauthorized. *Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2nd Cir.1995); *SOS, Inc.,* 886 F.2d at 1085. Plaintiff argues that because the assertion of a license is an affirmative defense, Defendants necessarily have the burden of establishing that the terms of the 1998 Netect license authorized their conduct. The Court finds Plaintiff's position here unconvincing.

■ As the Ninth Circuit has observed, "[g]enerally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract. If, however, a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1121–22 (9th Cir.1999) (internal quo-

tations marks and citations omitted) (vacating preliminary injunction, noting that before copyright holder can "gain benefits of copyright enforcement, it must definitively establish that the rights it claims were violated are copyright, not contractual, rights"). "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James,* 144 F.3d 229, 236 (2d Cir.1998) (citing *Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1338–39 (9th Cir.1990)). Where, the existence of a license is not in dispute, and only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized. *Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2nd Cir.1995) ("Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities."); *see also S.O.S., Inc.,* 886 F.2d at 1085 ("To prevail on its claim of copyright infringement, [the copyright owner] must prove . . . 'copying' of protectible expression by [the accused infringer] beyond the scope of [the] license.").

Here, Plaintiff's argument resembles the same one considered—and rejected—in *Bourne v. Walt Disney Co. See Bourne,* 68 F.3d at 631. There, the copyright holder, Bourne, argued that Disney, the accused infringer, had the burden of proving that its use was licensed. *Id.* at 630–31. The Second Circuit acknowledged that possession of a license by an accused infringer traditionally has been characterized as an affirmative defense, but noted that in most cases addressing the license defense, the issue has been whether a license existed. *Id.* at 631. Distinguishing those cases, the court observed that there was no dispute that Disney had received various licenses to copyrighted materials. *Id.* Thus, the court concluded, where the scope of the license, and not its existence, is at issue, "the copyright owner bears the burden of proving that the defendant's copying was unauthorized." *Id.*

 Similarly, here the parties have agreed to the existence of a license. (JSUF at ¶ 7.) More specifically, the parties agree to the existence of the 1998 Netect license consisting of one user *development license* for Netbula ONC RPC SDK and one *distribution license* for Netbula's runtime library. Because it is not in dispute that the 1998 Netect license existed, in order to meet its burden in this case, Plaintiff must prove that Defendants exceeded the scope of the license. "Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities. Just as in an ordinary contract action, the party claiming a breach carries the burden of persuasion." *Id.* at 631; *see also Vintage Verandah, Inc. v. Mastercraft Int'l, Inc.,* No. 4:04CV00066, 2006 WL 3735975 at *4 (D.Ark. Dec. 15, 2006) (applying Bourne where license existed but was not produced, and finding plaintiff did not meet burden of showing defendant exceeded scope of license even when defendant "fell behind on royalty payments"). As in *Vintage Verandah,* Plaintiff's initial hurdle is proving the terms of the license. *See id.* [8]

---

[8]. In the Opposition, Plaintiff does not attempt to distinguish, *Bourne.* And the other cases Plaintiff cites to suggest that it does not have this burden are distinguishable because they did not involve an existing license. *See Chamberlain Group, Inc. v. Skylink Techs.,* *Inc.,* 381 F.3d 1178, 1193 (Fed.Cir.2004) (addressing copying without license and noting that existence of a license is an affirmative defense); *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.,* 322 F.3d 26, 40 (1st

Plaintiff has not met this initial hurdle on the current record.

Moreover, there is no evidence in the current record that Netect actually saw or assented to any of the purported license restrictions Plaintiff now seeks to assert. *Id.* Plaintiff's Opposition argues that Plaintiff's past licensing practices may create a basis to establish the scope of the 1998 Netect license. However, the factual record is devoid of a single citation to any evidence, and the accompanying declaration of Don Yue purports to discuss licensing but only refers to Plaintiff's *current* practices, and fails to discuss what they might have been in July 1998 during the Netect transaction. (Yue Decl. at ¶¶ 11–17.)

 Instead, Plaintiff's effort to show enforceable license restrictions consist of citations to a handful of dubious documents, none of which create a triable issue of material fact. First, Plaintiff refers to and quotes what it calls its 1998–1999 version of "Netbula's standard license agreement." (Pl.'s Opp. at 7:3–21.) Yet Plaintiff offers no evidence that this "standard agreement" actually existed in July 1998, or that it was ever provided or agreed to by Netect. Moreover, Defendants have already adduced evidence that on those occasions when Plaintiff included its license form on disks it sent to customers, a customer could install and use the software without being forced (or even asked) to read, click on, or otherwise acknowledge or accept any terms or conditions of use. (Yue Depo. at 140:10–13;141:3–15; 257:14–258:12; 260:18–261:1.) The existence of an un-communicated "form" is inadequate to create contractual restrictions, and thus creates no question of fact. *See Specht v. Netscape Communications Corp.,* 150 F.Supp.2d 585, 596 (S.D.N.Y.2001), *aff'd,* 306 F.3d 17 (2d Cir.2002) ("The case law on software licensing has not eroded the importance of assent in contract formation.").

 Plaintiff next argues—again with no citation to competent evidence—that it sold products on its web site with a "fill in" form, and that "[i]n some cases, customers printed out and filled out the webform, then faxed the form back to Netbula." (Pl.'s Opp. at 7:23–25.) Plaintiff cites to a form from the year 2000—two years after the Netect transaction—ostensibly containing an "Explaination [sic] of license terms." (*Id.* at 8:1–9.) But Plaintiff offers no evidence that such a form was ever used in the 1998 Netect license agreement. Plaintiff also points to a purported "pricing table" that it received from a different customer by fax in October 1999 (more than a year after the Netect license). (*Id.* at 8:10–21.) However, all this document shows is that the standard price was $5995 for a "limited application distribution license" and that no limitation on quantity was included. Again, Plaintiff has no evidence that the parties used this form in consummating the 1998 Netect license.

 Finally, Netbula tries to show the existence of enforceable contract restrictions by citing to two lines of text. The first appears in a screen shot from a program called Rpcgen, part of the SDK tool, and states: "Netect Ltd., One user ONC

Cir.2003) (addressing issue of whether an implied license existed); *A & M Records, Inc. v. Napster, Inc.,* 114 F.Supp.2d 896 (N.D.Cal. 2000) (addressing alleged copying without license). Additionally, Plaintiff's reliance on *S.O.S.,* 886 F.2d at 1081, to attempt to escape its burden of proof is also misplaced. *S.O.S.* provides that burden of proving use "beyond the scope of [a] license" falls on the copyright holder. *Id.* at 1085. ("To prevail on its claim of copyright infringement, S.O.S. must prove (1) ownership of copyright in the payroll programs, and (2) 'copying' of protectible expression by Payday beyond the scope of Payday's license.").

RPC Dev License." (Yue Depo., Exh. 75.) But this reference to a purported limit to one user under the development license does not evidence a restriction on the separate distribution license that Netect received. The second line of text, which Plaintiff claims is contained in the pwrpc32.dll file itself, states: "Netect LTD. Dev License, Non distributable." (Pl.'s Opp. at 25:17–19.) However, again, Plaintiff adduces no competent evidence and offers no explanation how this reference to a development license created a restriction on Plaintiff's separately granted distribution rights. Once more, Plaintiff again fails to show that this text was ever seen by Netect. Notwithstanding Plaintiff's unsupported characterization of the text as a "license grant" (Pl.'s Opp. at 25:17–19), Plaintiff admits that this snippet of text was in the binary (machine readable) code itself, where no customer would see it. (Yue Depo. at 193:17–195:3.) In the end, none of these documents show the existence of limitations on Netect's distribution rights. Plaintiff's speculation as to the 1998 Netect license terms does not create a triable issue of fact sufficient to rebut Defendants' initial showing of an absence of triable issues of fact.

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's copyright infringement claim.

**B. Pulaski's Motion for Summary Judgment—Copyright Infringement and Fraud**

Pulaski moves for summary judgment as to Plaintiff's claims for fraud and copyright infringement. Because the Court has granted summary judgment in favor of Defendants as to the copyright infringement claim, the only remaining claim against Pulaski is the fraud claim. Plaintiff's fraud claim arises from three categories of alleged misrepresentations: (1) the October 25, 2005 and November 21, 2005 software usage reports provided by BindView (FAC ¶¶ 68, 69); (2) Pulaski's alleged statement on November 7, 2005 that BindView would provide "complete and accurate" information regarding BindView's software usage (*Id.* ¶ 69); and (3) BindView's November 8, 2005 proxy statement (*Id.* ¶ 74). Specifically, Plaintiff alleges that Defendants provided a false usage reports, and that Pulaski falsely promised to provide "complete and accurate" information as to BindView's usage of Netbula's software during the November 7, 2005 conference call.[9] Plaintiff claims that as a result of Defendants' promises Plaintiff delayed in bringing this action, thereby allowing Defendants to file a misleading proxy statement on November 8, 2005 informing the public that there was no copyright infringement litigation underlying the BindView–Symantec merger agreement.

To establish a fraud claim under California law, a plaintiff must show: (1) a misrepresentation (false representation, concealment, or non-disclosure); (2) knowledge of falsity (or "scienter"); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court,* 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996).

---

9. In his Opposition, Plaintiff asserts a new basis for fraud that is not alleged in the operative complaint. In particular, Plaintiff alleges that Pulaski's promise to pay "full license fees and interest" was false because Pulaski knew that the BindView–Symantec merger agreement limited the potential settlement to no more than $50,000. However because a plaintiff may not amend its complaint through argument in a brief opposing summary judgment, the Court will not address Plaintiff's new claim. *See e.g. Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1315 (11th Cir.2004).

In the current motion, Pulaski argues that Plaintiff cannot establish the essential elements of fraud under California law. Alternatively, Pulaski contends that even if Plaintiff were able to establish a tenable fraud claim, such a claim would be against BindView and not Pulaski, because Pulaski, as CEO of BindView, can only be liable for false statements that he authorized, directed, or participated in. Plaintiff's Opposition does not substantively respond to Defendants' arguments and is largely devoid of relevant factual citations to the record. Turning to the current factual record, the Court finds that Plaintiff has failed to adduce competent evidence of fraud.

■ As to the first element of fraud, there is an absence of competent evidence in the current factual record establishing that either the October 25, 2005 (original usage report) or the November 7, 2005 (promise to provide a "complete and accurate" usage report) representations were false. Plaintiff has failed to adduce evidence of the actual facts that would establish Defendants' representations as false. There is no evidence that Defendants did not produce each and every software usage record in their possession, and accordingly, Plaintiff has failed to sufficiently establish the initial element of its fraud claim. As to the second element, there is also an absence of competent evidence in the current record establishing that Defendants, at any time, had the requisite scienter or knowledge that either representation was false. See Cal. Civ.Code § 1710(1); *Harazim v. Lynam*, 267 Cal.App.2d 127, 130, 72 Cal.Rptr. 670 (1968). Finally, as to the third element, there is similarly an absence of competent evidence to establish that Defendants' intended to defraud Plaintiff. There is no evidence that Defendants or Pulaski did not intent to do provide accurate and complete usage information.

Accordingly, the Court **GRANTS** Defendant Pulaski's Motion for Summary Judgment as to Plaintiff's fraud claim.

## C. BindView's Motion for Summary Judgment—Breach of Contract and Fraud

### 1. Breach of Contract Claim

BindView moves for summary judgment as to Plaintiff's breach of contract claim. As best the Court can discern from Plaintiff's pleadings, Plaintiff's breach of contract claim against BindView arises from two events: (1) the breach of an alleged oral settlement agreement reached during the November 7, 2005 telephone conference attended by Yue on the one hand, and Pulaski and Toedt on the other; and (2) the breach of an alleged agreement under which Defendants were to provide a full and complete software usage report. BindView contends that neither event resulted in the formation of an enforceable contract. As to the first event, BindView argues that Plaintiff is unable to establish that the parties reached agreement on the necessary terms for contract formation, namely the quantity and the price for both site licenses and downloads. As to the second event, BindView argues that because Plaintiff can adduce no evidence that BindView failed to provide all of the information in BindView's possession, Plaintiff is unable to establish the necessary elements for a breach of contract claim.

In opposition, Plaintiff submits that Pulaski's deposition testimony, Toedt's notes of the November 7, 2005 telephone conference, and Yue's declaration all create triable issues of fact as to whether the parties intended to contractually settle the current dispute and as to whether the parties agreed that Defendants would provide the referenced usage reports.

Under California law, in order to form a valid and enforceable contract, it is essential that there be: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and, (4) a sufficient consideration. Cal. Civ.Code § 1550; *see Binder v. Aetna Life Ins. Co.*, 75 Cal.App.4th 832, 850, 89 Cal.Rptr.2d 540 (1999) (noting that a manifestation of mutual assent is required to form a valid contract). Contract formation also requires that the parties' reach mutual assent or consent on definite or complete terms. *Merced County Sheriff's Employees' Ass'n v. Merced County*, 188 Cal.App.3d 662, 670, 233 Cal.Rptr. 519 (1987) (emphasis added); *McClintock v. Robinson*, 18 Cal.App.2d 577, 582, 64 P.2d 749 (1937).[10] In this case, the parties do not dispute that they were capable of contracting or that their alleged agreement had a lawful object. Accordingly, the current legal issue is whether the parties mutually assented to a sufficiently definite set of terms to constitute an enforceable contract.

Mutual assent is accomplished when a specific offer is communicated to the offeree, and an acceptance is subsequently communicated to the offeror. *Russell v. Union Oil Co.*, 7 Cal.App.3d 110, 114, 86 Cal.Rptr. 424 (Ct.Cal.App.1970); *Patterson v. Clifford F. Reid*, 132 Cal.App. 454, 456, 23 P.2d 35 (1933). Mutual assent is determined from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understandings. *Merced County Sheriff's Employees' Ass'n*, 188 Cal.App.3d at 670, 233 Cal.Rptr. 519; *Blumenfeld v. R.H. Macy & Co.*, 92 Cal.App.3d 38, 46, 154 Cal.Rptr. 652 (Ct.Cal.App.1979); *Mey-er v. Benko*, 55 Cal.App.3d 937, 942–43, 127 Cal.Rptr. 846 (1976) (stating that California courts apply an objective test to ascertain whether there is mutual assent.).

Terms of a contract must also be sufficiently definite in all particulars essential to its enforcement. *Magna Development Co. v. Reed*, 228 Cal.App.2d 230, 39 Cal.Rptr. 284, 288 (Cal.Ct.App.1964) (citations omitted). A contract is void and unenforceable if it is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained. *California Lettuce Growers, Inc. v. Union Sugar Co.*, 45 Cal.2d 474, 481, 289 P.2d 785 (1955). While, neither law nor equity requires that every term and condition of an agreement be set forth in the contract, *King v. Stanley*, 32 Cal.2d 584, 588, 197 P.2d 321 (1948), the scope of the duty and limits of acceptable performance must be at least sufficiently defined to provide a rational basis for the assessment of damages in the case of breach, *Robinson & Wilson, Inc. v. Stone*, 35 Cal.App.3d 396, 407, 110 Cal.Rptr. 675 (1973). Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. *Ladas v. California State Auto. Ass'n*, 19 Cal. App.4th 761, 770, 23 Cal.Rptr.2d 810 (Ct. Cal.App.1993). The Court will now address the two events that give rise to Plaintiff's breach of contract claim and determine whether the factual record is sufficient to create a triable issue of fact as to the existence of an enforceable contract.

---

**10.** A contract need not be written to be legally binding; oral and written evidence may be received to establish the terms of the agreement between the parties. *Larsen v. Johannes*, 7 Cal.App.3d 491, 501, 503, 86 Cal.Rptr. 744 (Ct.Cal.App.1970); *California Food Serv. Corp. v. Great American Ins. Co.*, 130 Cal. App.3d 892, 897, 182 Cal.Rptr. 67 (Ct.Cal. App.1982); *see also Nicholson v. Barab*, 233 Cal.App.3d 1671, 1681, 285 Cal.Rptr. 441 (Ct. Cal.App.1991); *Kilpatrick v. Beebe*, 219 Cal. App.3d 1527, 1529, 269 Cal.Rptr. 52 (Ct.Cal. App.1990).

### a. Settlement Discussion During the November 7, 2005 Conference Call

■ As to the alleged November 7, 2005 oral settlement agreement, there is an absence of competent evidence in this record to sustain the existence of an enforceable contract. The record evinces that during the November 7, 2005 conference call, the parties had not yet mutually assented to sufficiently definite terms to create a binding contract. Plaintiff largely relies Toedt's notes of the November 7, 2005 conference call to support the existence of an enforceable contract. (Pl.'s Opp. 11:1–9.) According to Toedt's notes, as cited Plaintiff: (1) Pulaski told Yue, "We want to reach a reasonable solution— pay the full amount we owe you"; (2) on the issue of site licenses, Pulaski told Yue that, "We'll check on site licenses—work out some kind of average # admins"; (3) on the issue of pricing, "99–$50 for runtime license," "prepay—different price"; and (4) on the issue of downloads, Pulaski indicated that "We'll see what we can do w/download." Toedt's notes, by themselves, are insufficiently vague to evince mutual assent to the necessary terms. The notes do not indicate that either party agreed on how to count either site licenses or downloads, and do not connote an assent on how to price of the different licenses. Neither do Toedt's notes provide the Court with the sufficient objective guidance under which courts may supply omitted provisions. *See e.g. California Lettuce Growers, Inc. v. Union Sugar Co.,* 45 Cal.2d 474, 482, 289 P.2d 785 (1955); *Roberts v. Adams,* 164 Cal.App.2d 312, 315, 330 P.2d 900 (1958). For these reasons, the Court cannot find that Toedt's notes are sufficient to bind the parties to an enforceable contract.

■ The remaining evidence in the record similarly does not evince a mutual assent to sufficiently definite terms as required to form an enforceable contract. First, as to site licenses, Yue stated that during the November 7, 2005 discussion, "we were both trying to find a reasonable way to count this because under Nebula's licensing terms, those unlimited would be infinity and the result would not make sense." (Wakefield Decl. Ex. A, Yue Depo., 590:2–5.) Yue further testified that, "We didn't settle on any particular option [on how to account for site licenses . . . on November 7, 2005.]" (*Id.* at 591:23–592:17.) Second, as to downloads (or evaluation copies), Toedt testified that there was no agreement on how to deal with the question of evaluation copies. (*Id.,* Ex. F, Toedt Depo., 66:9–11.) Third, as to license fees, Yue testified that, "I told [Pulaski], you know, I don't have the number, but I can check. I recalled it was $50 per copy in the year 2000, and since then the price was—the price stayed about the same. And then we went to go—we go— went on to discuss about the interest rate." (*Id.,* Ex. A at 593:2–7.) Further, Yue conceded that Pulaski did not say that he would pay $50 per copy. (*Id.* at 583:10–12.). Fourth, as to the price as taken from Netbula's standard license—which Plaintiff says governs the price of the alleged settlement agreement—Yue also admitted that he does not think that Pulaski agreed to use it as a basis to establish the appropriate price. (*Id.* at 581:11–16.) Fifth, as to the interest rate, Yue similarly states that the parties did not reach an agreement and the issue was left open. (*Id.* at 593:19–594:8.) Lastly, and perhaps most importantly, Plaintiff's conduct subsequent to the alleged November 7, 2005 settlement agreement does not resemble the actions of someone who believed the parties had mutually assented to sufficiently definite terms. Plaintiff's acts included sending e-mails to Defendants in which he threatened to sue (*id.,* Ex. C), and wherein he expressed "renewed hope that we can

resolve this dispute in a fair and good faithed manner without going to Court." (Pulaski Decl. ¶ 25, Ex. 10.) Based on the foregoing evidence, the Court concludes that there is an absence of competent evidence to find a triable issue of fact as to whether an enforceable November 7, 2005 oral settlement agreement existed.

### b. Failure to Provide Full and Complete Software Usage Information

■ As to the alleged agreement under which Defendants were to provide a "complete, accurate, and verifiable royalty report," (Compl. ¶ 78) Defendants contend that assuming *arguendo* that there was such an agreement, there is no evidence to suggest that it was breached. The Court agrees.

Although Plaintiff fails to substantively address Defendants' argument, the Court's independent review of the current factual record provides no evidentiary basis on which a reasonable jury could conclude that Defendants breached the alleged agreement.

For these reasons the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's breach of contract claim.

### 2. Fraud Claim

BindView also moves for summary judgment as to Plaintiff's fraud claim. As noted above, Plaintiff's fraud claim against BindView arises from three alleged misrepresentations: (1) the October 25, 2005 and November 21, 2005 software usage reports provided by BindView (FAC ¶¶ 68, 69); (2) Pulaski's alleged statement on November 7, 2005 that BindView would provide "complete and accurate" information regarding BindView's software usage (*id.* ¶ 69); and (3) BindView's November 8, 2005 proxy statement (*id.* ¶ 74). Defendants contend that Plaintiff cannot produce evidence sufficient to satisfy the necessary elements of a fraud claim with respect to any of the alleged representations. Plaintiff generally argues that it has established the necessary elements, however its response is largely void of any citations to the factual record.

■ "To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153, 157, 2 Cal.Rptr.2d 861 (Ct.Cal.App. 1991). Affirmative evidence is necessary to avoid summary judgment because mere nonperformance is not enough to show intent to defraud. *See also Fanucchi v. United Agri Products*, 414 F.3d 1075, 1088 (9th Cir.2005); *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30, 216 Cal.Rptr. 130, 702 P.2d 212 (Ct.Cal.App.1985) ("Something more than nonperformance is required to prove the defendant's intent not to perform his promise.") (citation omitted).

■ Here, as to BindView's royalty and software usage reports, there is no evidence in the record to suggest that the reports were prepared with an intent to deceive Plaintiff. Similarly, as to the November 7, 2005 representation to provide "complete and accurate" reports, there is also no evidence from which a reasonable jury could find that Defendants intended to deceive Plaintiff at the time Pulaski made the representation. Finally, as to the November 8, 2005 proxy statement, Plaintiff has failed to identify competent evidence that the statement was false or that it was made to induce Plaintiff's reliance. To the contrary, the proxy statement was addressed to BindView shareholders in connection with the solicitation

of their approval of the merger, and was never sent to Netbula. For these reasons, the Court GRANTS Defendants Motion for Summary Judgment as to Plaintiff's fraud claim.

### D. Netbula's Cross–Motion for Summary Judgment Are Procedurally Improper

██ On July 31, 2005, Plaintiff filed pleadings that purported to cast its Oppositions to Defendants' Motion For Summary Judgment On Contract and Fraud Claims, and Motion For Summary Judgment On Copyright Claims, as "cross-motions" for summary judgment against Defendants. In addition, Plaintiff included, at the end of its Opposition to Pulaski's Motion for Summary Judgment one line that "requested that the Court grant its cross-motion for summary judgment against Pulaski on the fraud and copyright claim." (Pl.'s Opp. to Pulaski's Mot. at 15:28–16:1.) However, because Plaintiff's purported cross-motions fail to comply with the deadline for dispositive motions, the Court denies them as procedurally improper.

When discovery extended longer than expected in this action, on May 18, 2007, the Court considered the parties' Request to Extend Dates for Discovery, Dispositive Motions, and Trial. At that time, the Court maintained the prior trial date of October 1, 2007, and set a firm deadline of August 21, 2007 for hearing dispositive motions. (Minute Order, Docket No. 140.) Given that Order, Plaintiff had the responsibility to adhere to Local Rule 7–2(a) and file any motion for summary judgment at least thirty-five days before the Court's August 21, 2007 deadline for hearing dispositive motions. *See* Civ. L.R. 7–2(a). Indeed, Civ. L.R. 56–1 expressly provides that "motions for summary judgment or summary adjudication must be noticed as provided in Civil L.R. 7–2 and 7–3." Here, the applicable filing deadline of July 17, 2007 passed two weeks before Plaintiff filed its cross-motions.

For this reason, the Court **DENIES** Plaintiff Netbula's Cross–Motion for Summary Judgment as to Copyright Infringement.

### CONCLUSION

For the foregoing reasons, the Court:

(1) **GRANTS** Defendants' Motion for Summary Judgment as to Copyright Infringement;

(2) **GRANTS** Defendant Pulaski's Motion for Summary Judgment;

(3) **GRANTS** Defendant BindView's Motion for Summary Judgment as to Plaintiff's Breach of Contract and Fraud Causes of Action; and

(4) **DENIES** Plaintiff Netbula's Cross–Motion for Summary Judgment as to Copyright Infringement.

**IT IS SO ORDERED.**