Filed 5/2/16  Clifton v. City of Dinuba CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RYAN CLIFTON, Plaintiff and Respondent, v. CITY OF DINUBA, Defendant and Appellant | F070582 (Super. Ct. No. 254129) OPINION |

APPEAL from a judgment of the Superior Court of Tulare County.  Lloyd L. Hicks, Judge.

Tuttle & McCloskey, Daniel T. McCloskey and James F. McBrearty for Defendant and Appellant.

Goyette & Associates and Gary G. Goyette for Plaintiff and Respondent.

-ooOoo-

Dinuba Police Officer Ryan Clifton was fired for cause because he drew and, without anger or threat, pointed his service weapon at a police detective who had touched Clifton's gun and razzed him about being unable to draw the gun with his pepper spray in the way.

Clifton appealed the termination and the matter was presented to a mutually agreed arbitrator. During that proceeding, the City of Dinuba (City) dropped its allegations that Clifton had violated Penal Code section 417 (brandishing a firearm) and a policy manual provision addressing misdemeanor or felony statutes. The arbitrator ruled some of the policy violations against Clifton had been proven and reduced the discipline from a termination to a 30-day suspension. (Cf. *Taylor v. Crane* (1979) 24 Cal.3d 442 [arbitration award that reduced termination of police officer to 30-day suspension was confirmed] (*Taylor*).) Clifton filed a petition to confirm the award.

The trial court granted the petition to confirm the arbitration award, finding the parties agreed to present the matter to a neutral arbitrator under the Dinuba Municipal Code (Municipal Code) and agreed the decision would be binding. City appealed, contending there was no agreement to arbitrate outside the procedures set forth in the Municipal Code and those procedures only authorized judicial review by way of a writ for administrative mandamus under Code of Civil Procedure section 1094.5.[1] City argues that Clifton's petition to confirm was an unauthorized procedure because it was not brought under section 1094.5.

On appeal, a fundamental question is whether there was an agreement to arbitrate the dispute over Clifton's termination. Applying the rules of law governing contract formation, we conclude the parties agreed to an arbitration that would be final and binding, except that *either* party could seek timely judicial review under section 1094.5. The trial court correctly determined that judicial *review* of an arbitration award was not the same thing as judicial *confirmation* of the award. Consequently, the trial court had the necessary subject matter jurisdiction to confirm the arbitration award in accordance with the provisions of the California Arbitration Act (§ 1280, et seq.).

We therefore affirm the judgment.

---

[1]     All unlabeled statutory references are to the Code of Civil Procedure.

2.

# FACTS[2]

*The Incident*

Plaintiff Ryan Clifton was hired by City's police department in January 2007. On July 5, 2012, while assigned to the patrol bureau, Clifton was involved in an incident. He was suspended pending investigation and then discharged on August 10, 2012. Prior to the incident, Clifton had not received any discipline resulting in time off work.

The July 5, 2012, incident involved Clifton and Detective Jorge Quintero and occurred in the records department of the police department while both were on duty. Records clerk Lisa Esquivel was present. Clifton and Quintero were coworkers and friends who saw each other off duty. For many months prior to the incident, Quintero owed Clifton $15 for a hat Quintero bought from him and $5 on a bet Quintero lost about who would shoot better during a firearms qualification. Clifton had asked for the $20 on various occasions over a long time period, but Quintero had not paid. Clifton had never seemed angry about not being paid, and the two had never argued about it. They apparently talked about it in a joking manner.

On July 5, 2012, Clifton went in the records office to look in the files for a citation. Quintero was there when Clifton entered and Clifton asked Quintero again for the $20 he owed. Quintero said he did not have it. Clifton turned around and went to a filing cabinet to look for the citation. Quintero then came up while Clifton was partly turned around, touched the gun on Clifton's belt, and asked how he could get his gun out with the pepper spray canister there.[3] Clifton turned around, unsnapped his holster, drew

---

[2] Our description of events is taken from the "STATEMENT OF FACTS" (boldface omitted) in the arbitrator's 16-page written decision.

[3] The three people present agreed that Quintero came up to Clifton when his back was at least partially turned, touched the gun in some manner, and questioned how Clifton could get it out with the pepper spray there. However, the testimony about the touching differed. Quintero said that he touched the grip of Clifton's gun and pepper spray. Clifton stated that Quintero grabbed the butt of his gun and kind of shook it. Esquivel said Quintero touched the gun.

3.

his gun, pointed it at Quintero's stomach for about two to three seconds, said something to the effect that see, he could get it out, and then put it back in his holster. Quintero then told Clifton not to point his gun at him. Clifton replied by telling Quintero not to touch his gun. Clifton walked away from Quintero to another part of the records office to look for the citation. Quintero told Clifton a second time not to point his gun at him. Then Quintero told Clifton a third time not to point his gun at him. Clifton turned around and approached Quintero, and they spoke to each other in raised voices, with Quintero saying something about them going to talk to someone. Clifton told Quintero again not to touch his gun and turned his back again to look in the file cabinet. When Clifton finished with the files, he left the records office.

Clifton testified that he was not angry when he pointed his gun at Quintero and he did it to show he could draw his weapon in answer to Quintero's question. Quintero testified that Clifton was not aggressive when he drew the gun and pointed it. Quintero also testified that he was not afraid, but surprised, and he did not believe Clifton intended to harm him. Esquivel testified that Clifton and Quintero became loud and the incident surprised and shocked her, but she was not afraid and did not believe Clifton and Quintero were going to fight. She did not call anyone to intercede and did not report the incident.

*Quintero's Report*

Quintero left the records office after Clifton and immediately was approached by his supervisor, Sergeant Iriarte, about another matter. Quintero had not planned to report the incident to management, but he was upset and told Iriarte about it. Iriarte was about to finish his shift, so he asked Sergeant and Range Master Ryan Robison to handle it. Robison spoke to Quintero and sent a memorandum to Lieutenant Devon Popovich, who was serving as acting chief while Police Chief James Olvera was on vacation.

4.

Quintero signed a non-prosecution form the day of the incident and decided not to pursue criminal charges against Clifton. No one at the police department ever told Quintero that he should pursue charges.

*Management's Reaction*

Popovich intended to speak to Clifton the next morning and phoned Clifton to tell Clifton to see him then. Popovich said nothing about taking Clifton off work at that time.

However, Popovich reported the incident to the city manager and it was decided that Clifton would be put on administrative leave immediately. Popovich phoned Clifton again and told Clifton he would come to his house that evening. Popovich and Robison went to Clifton's house, where Popovich informed Clifton that he was on administrative leave and asked for Clifton's gun, which Clifton gave to him.

By memorandum dated July 6, 2012, Popovich informed Clifton that he was under investigation regarding his conduct on July 5 and would be on paid administrative leave during the investigation. The memorandum stated that (1) Clifton allegedly pulled his service pistol from the holster and pointed it at a detective; (2) these allegations were serious, possibly criminal, and violations of City's policies; and (3) assistance had been sought from (a) the Tulare County Sheriff's Department to investigate the alleged criminal violation and (b) an independent investigator conducting an internal investigation. The memorandum informed Clifton of his rights during the investigations.

*The Investigations*

The sheriff's department investigator interviewed Quintero, Esquivel, and Robison on July 10, 2012, and submitted a report of their statements. Clifton declined an interview request. City filed a crime report against Clifton with the sheriff's department on July 12 alleging a misdemeanor.

Popovich informed Clifton in a memorandum dated July 16, 2012, that City had retained Law & Associates Investigations (LAI) to conduct an internal affairs investigation. The memo informed Clifton that he was scheduled for an interview with

5.

the investigator on July 20, 2012, and ordered him to cooperate fully. On July 24, 2012, LAI issued a written report based on its interviews with Quintero, Esquivel, and Clifton. The report concluded that Clifton had removed his gun from its holster and pointed it at Quintero. The report stated Clifton was "adamant" that he did it in a joking manner after Quintero touched his gun and joked that Clifton could not draw it because his pepper spray was blocking it. The report concluded by listing three "possible" police department policy section violations and one Penal Code violation.

Also in July 2012, City required Clifton to go to a fitness for duty examination with a psychiatrist. The psychiatrist did not find that Clifton had any underlying issues making him unfit for duty.

*The Workplace Environment*

While the incident was under investigation, Robison, the range master who is responsible for training officers on firearm use, went to Olvera and suggested that the incident be made a training issue for the entire department. Robison said he believed Clifton deserved discipline, maybe counseling or some days off, but not discharge. Olvera told Robison that the matter was out of his hands.[4] Robison testified that, as range master, he felt somewhat responsible if officers were not handling their guns properly. Robison also testified that it is not normal for an officer to touch another officer's gun.

Sometimes, officers practiced "quick draw" in the police department's briefing room, where they joked and pointed their guns at each other. Some officers who testified at the hearing had either witnessed quick draw or heard rumors about it. During the investigation of the incident, Clifton asserted that practice of quick draws had been taking place. Popovich asked Clifton for the names of officers involved, and Clifton provided four names.

---

[4] By February 2013, Olvera had retired and Popovich was police chief.

6.

Popovich interviewed the four officers and one admitted that he had engaged in quick draw. No other witnesses were interviewed regarding that officer's admission; no evidence was presented that any further investigation was done or that the officer was disciplined. The officer was not discharged. Two officers told Popovich that they had seen a different officer engage in quick draw, but that officer denied it. Popovich testified that he did not take the investigation further or discipline the officer because it was two officers' word against the other officer.

After the Clifton-Quintero incident, City's police department sent out a safety memorandum to officers with its policy on firearms attached.

*Notice of Intent to Terminate*

Police Chief Olvera gave Clifton a notice of intent to terminate dated July 31, 2012, that proposed Clifton's termination by City no later than 10 working days from that date, with Clifton remaining on administrative leave with pay. The proposed termination was based on violations of (1) five provisions in the department's policy and procedure manual,[5] (2) Penal Code section 417, (3) four provisions in chapter 13 of City's personnel policies and practices,[6] and (4) City's workplace violence policy No. 1996-01.

The notice stated Clifton's conduct amounted to a criminal assault and could expose him and City to liability. It also stated the proposed termination was based on the above policies, the two investigations, and the criminal allegations. The notice informed Clifton of his appeal rights.

---

[5] The notice cited manual section 340.3.2(d)—engaging in horseplay with a reasonable possibility of causing injury; section 340.3.2(k)—discourteous or disrespectful treatment of a member of the department; section 340.3.5(z)—violating a felony or misdemeanor statute; section 340.3.5(aa)—conduct unbecoming a member of the department; and 340.3.6—violating departmental safety standards and safe working practices.

[6] The sections cited were B(4)—inexcusable neglect of duty; B(13)—discourteous treatment of other employees; B(16)—misuse of public property or equipment; B(19)—failure of good behavior during duty hours that causes discredit to City.

*Termination Notice*

On August 7, 2012, a *Skelly*[7] hearing was held where Clifton and his representative met with Olvera to respond to the notice of intent to terminate. On August 10, 2012, Olvera issued a notice of termination effective that day. The grounds listed for the termination, the factual conclusions, and the bases were the same as those in the notice of intent to terminate. The notice informed Clifton of his appeal rights, including the right to a formal hearing.

*Administrative Appeal or Arbitration*

The next steps taken by the parties were guided by Municipal Code section 2.36.830, which is labeled "Evidentiary hearing." Municipal Code Section 2.36.830, subdivision (A) states that a regular employee who has received notice of punitive action and has gone through the grievance process shall be afforded an evidentiary hearing. When the punitive action is termination, "the hearing officer shall be an arbitrator from either the American Arbitrat[ion] Association[8] or from a list available from the State of California, Department of Industrial Relations on grievances dealing with terminations."[9] (Mun. Code, § 2.36.830, subd. (B).) The Municipal Code states that both City and the employee have the right to counsel, the right to call and examine witnesses for or against them, and the procedural due process rights applicable to administrative proceedings.

---

**7** In *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 (*Skelly*), the California Supreme Court held that public employees have a property interest in their continued employment that is protected by the due process clause. (*Id*. at pp. 207-208.) A *Skelly* hearing is an administrative hearing that gives the employee an opportunity to present his or her version of the relevant events *before* termination.

**8** We have not located, or ever heard of, the American *Arbitrator* Association. Therefore, we read this provision of the Municipal Code as referring to the American Arbitration Association.

**9** The reference to "an arbitrator" identifies who is qualified to act as a hearing officer in the administrative proceedings involving a terminated employee, not that the proceeding conducted by that individual will be an arbitration.

(Mun. Code, § 2.36.830, subd. (F).) The hearing officer is not bound by technical rules of evidence and his or her decision shall not be invalidated by any informality in the proceedings. (Mun. Code, § 2.36.830, subd. (E).) "The decision of the hearing officer shall be in writing and shall be final and binding." (Mun. Code, § 2.36.830, subd. (G).)

The parties selected Boren Chertkov as the person who would conduct the proceedings. Chertkov was born in 1938, graduated from the University of Texas Law School in 1963, and had a wide variety of experience in labor relations law at both the federal and state level. For example, he worked for the National Labor Relations Board in Washington, D.C. and served as general counsel to the California Agricultural Labor Relations Board from 1978 to 1983.[10]

On February 13, 2013, the hearing before Chertkov was held in Dinuba. Portions of the hearing transcript that address the parties' stipulations about the nature of the proceeding are quoted in part II.C.1, *post* and, consequently, are not set forth here. Near the close of the hearing, counsel agreed to email briefs to Chertkov by March 15, 2013.

The parties were advised by letter dated April 24, 2013, that Chertkov had passed away, but had completed a decision in the matter. The letter stated Chertkov's decision was not signed or dated and asked the parties how they wished to proceed. The parties agreed to accept the unsigned decision, which they received on May 24, 2013.

The decision stated that Clifton's grievance was granted in part and denied in part, with the discharge being reduced to a 30-day suspension. The decision's award directed that Clifton be made whole for the losses suffered as a result of the discharge, including immediate reinstatement with backpay (less 30 days), restoration of seniority, and expungement of the discharge from Clifton's employment records.

---

[10]    Chertkov died on April 15, 2013, about two months after the evidentiary hearing.

## PROCEEDINGS

On November 8, 2013, Clifton filed a petition to confirm a contractual arbitration award. Clifton used the optional Judicial Council Form ADR-106 (new Jan. 1, 2004) and completed the item addressing the terms of the arbitration agreement by attaching a copy of Municipal Code section 2.36.830 (evidentiary hearing).

City's response was twofold. First, on December 10, 2013, City filed a verified petition for writ of administrative mandamus alleging the arbitrator (1) prejudicially abused his discretion by reducing Clifton's punishment, (2) proceeded without or in excess of his jurisdiction, (3) made a decision not supported by his findings, and (4) made incorrect findings not supported by substantial evidence.

Second, City filed a demurrer to Clifton's petition and a request for judicial notice of Municipal Code section 2.36.810 (appeal and grievance—judicial review).

Clifton opposed City's demurrer and requested judicial notice of Municipal Code section 2.36.830, the provision he had attached to his petition and which governs the evidentiary hearing afforded employees aggrieved by disciplinary action. Clifton also filed a demurrer to City's writ petition.[11]

In January 2014, the trial court overruled City's demurrer, as was proposed in its tentative ruling. The tentative stated: "The parties hereto chose the forum of a neutral arbitrator whose decision would be binding according to their own municipal code.[[12]] If

---

[11]    Clifton's demurrer was sustained without leave to amend on March 13, 2014. The trial court, citing section 1094.6, determined City's petition was untimely because it was filed more than 90 days after City's receipt of the decision.

[12]    The trial court's determination that the Municipal Code provided for binding arbitration is consistent with the arguments presented by the parties. We conclude the Municipal Code does not provide for arbitration and that the parties agreed to an arbitration that tracked many (but not all) of the procedural steps set forth in the Municipal Code for administrative hearings of employee terminations. (See pt. II.C.3, *post*.) This slight disagreement with the trial court over interpretation of the Municipal Code and the nature of the parties' agreement does not automatically lead to a reversal. Under California law, appellate courts are not concerned with the trial court's reasoning,

---

10.

they wanted something other, they need to rewrite the code. Thus, [Clifton] has filed the correct vehicle to obtain the relief requested, confirmation of the arbitration award under Code of Civil Procedure section 1285, et seq." The court went on to state that an arbitrator's award was not an administrative decision and, thus, not subject to the Municipal Code provision authorizing a writ of mandate for review of an administrative decision. We interpret the court's decision as concluding that (1) arbitration was a procedure available under the Municipal Code and (2) the parties chose to proceed with a binding arbitration according to the Municipal Code.

In February 2014, Clifton set a hearing on his petition to confirm the arbitration award. The parties submitted additional papers and, on March 13, 2014, the trial court held a hearing on the petition. The court's minute order stated City's response was not timely filed and, thus, need not be considered. Alternatively, the court stated that City was time-barred from (1) seeking its own petition to correct or vacate the arbitration award or (2) asserting such a request in its response to Clifton's confirmation petition. In addition, the court stated:

> "The parties agreed to have this matter heard before a neutral arbitrator whom they selected, and agreed that the decision would be binding. Further, when the arbitrator died before signing the decision, the parties agreed to accept the decision without a signature. The arbitrator's decision set forth the issues to be determined."

In August 2014, the trial court entered a judgment in favor of Clifton stating that his petition and the relief requested was granted in its entirety and the arbitration award

only with whether the final result was correct or incorrect. (*Kaldenback v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 843; Cal. Const., art. VI, § 13 [judgments shall be set aside only if the error resulted in a miscarriage of justice].) As described below, we conclude the final result—confirming the arbitration award—was correct because the parties agreed to binding arbitration of the dispute over Clifton's termination and that agreement, which incorporated some procedures from the Municipal Code, is the foundation for the arbitration award confirmed by the trial court under authority granted by the California Arbitration Act.

and the relief stated therein was confirmed.  The judgment also directed City, within 30 days, to (1) pay Clifton's back pay and related retirement contributions through July 31, 2014, and (2) reinstate Clifton to his former position in the police department with full restoration of seniority and with expungement of his discharge from City's records.

City filed a timely notice of appeal.

## DISCUSSION

### I.   THE MUNICIPAL CODE AND ARBITRATION

The trial court determined that the parties agreed to arbitration in accordance with the Municipal Code.   Clifton's appellate brief argues that he "demonstrated an agreement to arbitrate based on the City's [Municipal Code] so the arbitrator's decision is final and binding and not subject to judicial review."  (Full capitalization and boldface omitted.)   City's opening brief contends that "there was never an agreement to arbitrate outside the provisions of the [Municipal Code]."

The trial court's determination and the parties' contentions raise the fundamental question of whether the Municipal Code actually provides for the arbitration of employee terminations.  (See fn. 12, *ante*.)  For instance, City's assertion that there was never an agreement "outside" the Municipal Code presents the possibility that there was an agreement to arbitrate "inside"—that is, pursuant to—the provisions of the Municipal Code.

Part I of this opinion addresses whether the Municipal Code provides for arbitration.  We conclude it does not.  Part II analyzes whether the parties entered into (i.e., formed) an enforceable contract to arbitrate their dispute in lieu of the administrative proceeding set forth in the Municipal Code.  We conclude they formed such a contract.

12.

A.       Construction of the Municipal Code

          *1.       Standard of Review and Rules of Construction*

The construction of a city charter or a municipal code is a question of law subject to de novo review an appeal.  (*Hall-Villareal v. City of Fresno* (2011) 196 Cal.App.4th 24, 29.)  As with statutory construction, our primary goal is to ascertain the intent of the legislative body so as to effectuate the enactment's purpose.  (*Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019, 1027.)  Construing legislation begins by scrutinizing the actual words in the code and giving them their usual, ordinary meaning. (*Ibid.*)  Aside from provisions from the city charter, no extrinsic materials were presented to aid our construction of the Municipal Code.

          *2.       Words Used in the Municipal Code*

Chapter 2.36 of the Municipal Code addresses personnel policies and practices. That chapter does not use the word "arbitrate."    However, the word "arbitrator" and "arbitration" (see fns. 8 & 9, *ante*) appears in two provisions, both addressing the same subject.  Municipal Code section 2.36.800 describes the formal procedures for grievances and appeals.  Subdivision (C)(2)(b) of that section provides:

> "Terminations.  The hearing shall be heard and the final determination be
> made by an *arbitrator* from either the American Arbitrat[ion] Association
> or from a list available from the State of California, Department of
> Industrial Relations."  (Italics added.)

This use of "arbitrator" and "arbitration" is repeated in Municipal Code section 2.36.830, which describes various aspects of the evidentiary hearing provided as the third step in the formal procedures.  Municipal Code section 2.36.830, subdivision (B) states that "the hearing officer shall be an *arbitrator* from either the American Arbitrat[ion] Association or from a list available from the State of California, Department of Industrial Relations on grievances dealing with termination."  (Italics added.)

The statements that "the hearing officer shall be an arbitrator," when read in context of the Municipal Code's other provisions that make no reference to arbitration or

arbitration awards, are insufficient support for the inference that the proceeding conducted under the Municipal Code is an arbitration. We interpret the references to "an arbitrator" as identifying individuals qualified or eligible to act as a hearing officer in an evidentiary hearing involving a terminated employee. We have located no language in the other provisions of the Municipal Code that support the inference that the procedure involving terminated employees is an arbitration. For instance, "[e]videntiary hearing" is defined for purposes of chapter 2.36 of the Municipal Code as "an administrative hearing for the purpose of discovery of evidence for proposed disciplinary actions and provides affected employees [an] opportunity to rebut such reasons." (Mun. Code, § 2.36.070, subd. (30).) This description of the hearing as "administrative" and the absence of any reference to arbitration supports the inference that the hearing is not part of an arbitration proceeding. In addition, the many uses of the term "hearing officer" in the Municipal Code reinforces the inference that the procedure authorized is an administrative hearing and not an arbitration.

Therefore, we conclude that the uses of the word "arbitrator" were not intended to mean the hearing officer selected would conduct an arbitration. Therefore, we interpret the Municipal Code as providing terminated employees with an administrative hearing conducted by a hearing officer (albeit one selected from a pool of arbitrators) who renders an administrative decision, not an arbitration award.

B.     Municipal Code as a Bar to Arbitration

Having determined that the Municipal Code does not expressly authorize arbitration of dispute involving the termination of an employee, the next question is whether the Municipal Code (or city charter) prohibits the parties from agreeing to arbitrate their dispute. In other words, are the procedures set forth in the Municipal Code mandatory such that any attempt to alter those procedures is void?

14.

This question is easily resolved by California Supreme Court precedent. In *Taylor*, *supra*, 24 Cal.3d at p. 451, the court stated:

> "It has long been recognized that a city may agree to arbitrate any matter which could be the subject of civil suit. [Citation.] Discipline of a permanent city employee is such a matter. [Citations.] Thus, unless the charter expressly prohibits the city from agreeing to arbitrate whether [the police officer's] conduct was sufficient cause for his discharge, the city retains the power to do so."

Here, the City's second request for judicial notice included provisions of its city charter. The City has not cited, and our review has not located, a provision expressly prohibiting the City from agreeing to arbitrate employment disputes. Therefore, the City retained the power to do so. (*Taylor*, *supra*, 24 Cal.3d at p. 451.)[13]

## C. Attorney Authority to Stipulate to Arbitration

The primary source of a potential agreement to arbitrate the dispute over Clifton's termination relates to the stipulations made by the parties' attorneys, which were recorded in the transcript of the proceedings conducted before Chertkov. Consequently, another issue relating to the validity of any agreement to arbitrate is whether the attorneys

---

[13]    As background, we note that *Taylor* is similar to this case in that *Taylor* involved (1) a police officer who was discharged, (2) an arbitration award that concluded the discipline was too severe and directed the reinstatement of the officer after a 30-day suspension, and (3) a lawsuit seeking judicial confirmation of the arbitration award. (*Taylor*, *supra*, 24 Cal.3d at pp. 445-446.) The police officer's employment was terminated because he shot a suspected burglar during an off-duty foot pursuit. (*Id*. at p. 445.) The parties signed a written agreement for an arbitrator to decide whether the officer was properly discharged and, if not, what the remedy should be. (*Ibid*.) The arbitrator determined the officer's conduct constituted sufficient cause for a disciplinary suspension of 30 days, but otherwise reinstated him at the same rank with back pay. (*Id*. at p. 446.) The arbitrator found it significant that the district attorney expressly determined the officer's actions did not warrant criminal prosecution. (*Ibid*.) After the city refused to honor the arbitration award, the police association filed for judicial confirmation of the award. (*Ibid*.) The Supreme Court reversed the trial court's judgment and directed it to confirm the arbitrator's award. (*Id*. at p. 453.)

were authorized by their clients to stipulate to binding arbitration. (See generally, 1 Witkin, Cal. Proc. (5th ed. 2008) Attorneys, § 252 [stipulating to binding arbitration].)

Whether the City expressly or impliedly authorized its attorneys to stipulate to an arbitration and whether Clifton authorized Horton to stipulate to an arbitration are questions of fact that were not litigated before the trial court. More specifically, the City did not challenge Clifton's petition to confirm a *contractual* arbitration award on the ground that the City had not authorized its attorney to enter into a contract to arbitrate. As a result, the City presented no evidence to establish the lack of authorization. In light of this state of the record, we conclude the factual question of the attorney's authority to stipulate to arbitration cannot be resolved on appeal in favor of the City.

II.     FORMATION OF A CONTRACT TO ARBITRATE

Based on our determinations that (1) the Municipal Code does not *provide for* arbitration of employment disputes and (2) the Municipal Code and city charter do not *prohibit* contractual arbitration as a means to resolve those types of disputes, the next question is whether the parties entered into (i.e., formed) a contract to arbitrate the dispute over Clifton's termination. Our analysis of this question involves issues relating to the formation of a contract and the identification of the terms of any such contract.

A.     Rules Governing Contract Formation

1.     *Elements of a Contract*

Under California law, a contract is formed when the following essential elements are present: (1) parties capable of contracting, (2) the consent of those parties, (3) a lawful object, and (4) adequate consideration. (Civ. Code, § 1550; see BAJI No. 10.55 [contract defined/elements].) "The consent of the parties to a contract must be: 1. Free; [¶] 2. Mutual; and, [¶] 3. Communicated by each to the other." (Civ. Code, § 1565.) Mutual consent is determined under an objective standard applied to the outward manifestations or expressions of the parties—that is, the reasonable meaning of their

16.

words and acts, and not their unexpressed intentions or expectations. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 (*Codemasters*).) The existence of mutual consent presents a question of fact. (*Ibid.*)

The formation of an enforceable contract also requires the terms of the agreement to be reasonably certain. (*Codemasters*, *supra*, 104 Cal.App.4th at p. 141.) The purpose of the certainty requirement is to provide a basis for determining the existence of a breach of the agreement and for giving an appropriate remedy. (*Ibid.*)

### 2. Standard of Review

Generally, whether undisputed facts establish a contract can be decided by an appellate court as a matter of law. (*Codemasters*, *supra*, 104 Cal.App.4th at p. 141.) Here, the parties do not contend that the transcript of the proceedings before Chertkov inaccurately records the terms of their stipulations.

### B. Contentions

### 1. City's Contentions

City contends there was no agreement to arbitrate *outside the provisions of the Municipal Code*. In the context of these issues relating to contract formation, City's contention can be interpreted in two ways. First, City might be arguing that no contract was formed. Second and alternatively, City might be arguing that a contract was formed, but its terms tracked or incorporated the provisions of the Municipal Code. Stated another way, City may be arguing that, even though the parties could have agreed to something else, they agreed their arbitration would be subject to the procedures and other requirements that the Municipal Code imposes on administrative hearings and decisions.

As to standard of appellate review, City contends the facts are not in dispute and this court must interpret the Municipal Code, which presents a question of law subject to de novo review.

17.

## 2. Clifton's Contentions

Clifton's petition to confirm a contractual arbitration award necessarily was based on the allegation that there was an agreement to arbitrate. He attached provisions from the Municipal Code to support this allegation. Clifton opposed the City demurrer to his petition by stating the City had failed "to adhere to the arbitration process set forth in its own municipal code." On appeal, Clifton contends, somewhat ambiguously, that he "demonstrated an agreement to arbitrate based on the City's [Municipal Code] so that the arbitrator's decision is final and binding and not subject to judicial review." (Some capitalization and boldface omitted.)

Like City's contention, Clifton's argument is subject to different interpretations. First, he could be arguing that the parties simply agreed to abide by the arbitration procedures set forth in the Municipal Code. We reject this argument based on our conclusion that the Municipal Code does not provide for arbitration, but provides terminated employees with an administrative hearing conducted by a hearing officer who renders an administrative decision. (See pt. I.A, *ante*.) Second, Clifton might be arguing that the parties agreed to an arbitration proceeding that would be subject to some or all of the procedures set forth in the Municipal Code for administrative hearings. This is the type of agreement we address below.

### C. Formation of an Agreement to Arbitrate

#### 1. Evidence Relating to Mutual Consent and the Terms

The evidence before this court includes the November 2013 declaration from Peter Horton, the attorney who represented Clifton at the February 2013 hearing. The evidence also includes a transcript of the February 2013 hearing, which sets forth the words used in the stipulations made by counsel at that hearing.

Horton's declaration stated that, prior to the arbitration hearing, he and the attorney representing City stipulated that the grievance steps were completed or waived and that the grievance was properly before the arbitrator. The declaration stated that the

18.

attorneys "mutually agreed that the Arbitrator would be Boren Chertkov" and that "[t]he parties further understood and agreed that the arbitration would be final and binding."[14] We note that the declaration assumes the proceeding was an arbitration, rather that setting forth the who, what, when, where and how relating to the communication of an offer to arbitrate and its subsequent acceptance.

Horton's declaration also addressed the agreement reached after the hearing in which the parties resolved issues created by Chertkov's death. Chertkov had prepared a written decision, but had not dated, signed or issued it. The parties agreed to accept the unsigned decision. Counsel for City sent Chertkov's widow an email advising her of the parties' agreement and requesting her to send him the decision and the bill for Chertkov's services.

The transcript of the February 2013 proceedings before Chertkov is part of the appellate record because we granted City's request to augment the appellate record. City made the request to support its argument that Horton inaccurately described the parties' stipulation. The transcript shows Chertkov began the proceedings with some introductory remarks about the matter in dispute, the location of the hearing, the recording of the proceedings, and then stated:

> "All right. At this point, I'll ask that the parties prepare to stipulate that the grievance steps have been completed or waived and that the case is properly at the arbitration stage.

---

**14** The phrase "final and binding" echoes the sentence in Municipal Code section 2.36.830, subdivision (G) that "[t]he decision of the hearing officer shall be in writing and shall be final and binding." Thus, the use of the phrase may demonstrate (1) an intent for the arbitration procedure to track the Municipal Code's procedures for administrative hearings, (2) an intent that the arbitration award would be "final and binding" as that phrase is understood in case law addressing arbitration decision, or (3) both. (See *State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 517 [an arbitrator's decision that is "final and binding" is subject to judicial review only on the limited grounds set forth in § 1286.2].)

"MR. HORTON:  That is my understanding.

"ARBITRATOR CHERTKOV:  All right.  And do the parties stipulate that the arbitrator's award in this case will be final and binding?

"MR. HORTON:  Yes.

"MR. McBREARTY:  Yes.

"ARBITRATOR CHERTKOV:  I have not had an opportunity to read the memorandum of understanding.  Some of these in city and county governments have an appeal process.

"MR. McBREARTY:  It will be final and binding unless one of the parties wanted to go to Superior Court on a writ.  You can still do that.

"MR. HORTON:  It's a writ of mandate 1094.5 -- (INAUDIBLE)

"MR. McBREARTY:  Writ of mandate.

"ARBITRATOR CHERTKOV:  All right.  I'll recognize that and I'll leave room for that.  Can the parties – or have the parties reached agreement on what the issue is this morning?"

"MR. HORTON:  Well, I believe, if I don't speak out of turn, that issue is whether there is just cause to terminate – just cause to prove the charges against Officer Ryan Clifton and then secondarily, whether or not if those charges are proven then what is the appropriate penalty.

"MR. McBREARTY:  That's correct.

"MR. HORTON:  (Inaudible).

"ARBITRATOR CHERTKOV:  All right.  Do the parties stipulate that the arbitrator will retain jurisdiction upon issuance of award in case there's any problem about implementation of that award?

"MR. McBREARTY:  Yes.

"MR. HORTON:  Yes, the parties stipulate."

After this exchange, Chertkov addressed which party would present witness testimony and documentary evidence first and the right to cross-examine witnesses.

20.

To summarize, the evidence before this court relevant to the formation and content of an agreement is (1) Horton's declaration, (2) the transcript of the February 2013 hearing, (3) the written communication exchanged after the hearing and before the award was issued, and (4) the provisions of the Municipal Code relating to employee termination.

### 2. *Communicated Assent and Certainty of Terms*

The evidence—specifically, the transcript of the February 2013 hearing and Horton's less detailed declaration—shows that counsel for the parties communicated their assent to one another by entering into stipulations before Chertkov. Thus, it is clear the parties formed an agreement, but they dispute its terms. One possibility is that the parties agreed that the arbitration would proceed in accordance with the provisions of the Municipal Code. Another possibility is that they agreed to an arbitration proceeding that followed some, *but not all*, of the procedures applied to the administrative proceedings under the Municipal Code. A third possibility is that they never agreed to any type of arbitration.

Whether the parties mutually consented to a particular term (such as arbitration) is determined under objective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. (*Merced County Sheriff's Employee's Assn. v. County of Merced* (1987) 188 Cal.App.3d 662, 670 (*Merced Sheriff*); Civ. Code, §§ 1581 [communication of consent], 1636 [mutual intention at the time of contracting is ascertained].) The first term of the parties' agreement we address is whether they agreed to an *arbitration* or, alternatively, simply agreed to proceed with an administrative hearing in accordance with the provisions of the Municipal Code.

### 3. *Ambiguity of Agreement to Arbitrate*

The transcript of the hearing provides a record of the words used by the parties and Chertkov to make their stipulations. Those words, however, do not provide an

explicit, clear answer to the question of whether the parties agreed to an arbitration. Instead, the words are ambiguous—that is, reasonably susceptible to more than one interpretation. (See *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 747, 754 [parties to ambiguous oral agreement did not dispute the words used, but differed materially as to what those words meant].)

California law provides a well-established framework for resolving contractual ambiguities. The only place ambiguity is addressed in the appellate briefing is City's opening brief, which contends "the trial court ignores the plain language of the [Municipal Code, its] context and that there is conflict and ambiguity based on [Clifton's] insistence that the substance of the agreement does not include the section [of the Municipal Code] entitled 'Appeals—Grievance.'" Notwithstanding the parties' approach to the ambiguity of the words they exchanged, we will address particular statements from the transcript and discuss the inferences that can be drawn from those statements.

First, counsel agreed with Chertkov's statement "that the case is properly at the arbitration stage." Neither attorney objected to the term "arbitration" or stated the proceeding should be characterized as an evidentiary or administrative hearing. The use of the word "arbitration" supports the inference that the parties agreed to an arbitration and that Chertkov was there to act as an arbitrator, not simply a "hearing officer" conducting an "administrative proceeding" and rendering a "administrative decision." (Mun. Code, § 2.36.830, subds. (B), (D), (E) & (G), § 2.36.810.)

Second, counsel answered "Yes" when asked, "do the parties stipulate that the arbitrator's award in this case will be final and binding?" The term "arbitrator's award," like the earlier reference to "the arbitration stage," provides some support for the inference that the parties agreed to an arbitration. Also, the phrase "final and binding" is consistent with arbitration because that phrase often appears in arbitration clauses. (E.g., *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 7, fn. 1; *Butchers' Union Local 229 v. Cudahy Packing Co.* (1967) 66 Cal.2d 925, 940 [collecting bargaining agreement].)

22.

Third, when Chertkov asked about an appeal process, counsel for City stated, "It will be final and binding unless one of the parties wanted to go to Superior Court on a writ." Counsel for Clifton confirmed this statement by saying, "It's a writ of mandate 1094.5 -- (Inaudible)." This exchange is subject to conflicting interpretations on some points. However, the exchange is clear on the agreement that *either* party could pursue a writ in court. This is an important term of the agreement because it contradicts the Municipal Code and, thus, demonstrates that the parties were agreeing to something other than (i.e., outside) what the Municipal Code provided. Judicial review of administrative decisions is addressed by the Municipal Code as follows:

"2.36.810  Appeal and grievance – Judicial review.

"A.     See Resolution No. 91-36 on time limits on judicial review. *Employees seeking a judicial review of administrative decisions* including hearings, suspension, demotions, or terminations shall file a writ of mandate (written authoritative order) no later than the ninetieth day following the date on which the administrative decision becomes final.

"B.     The city must, at the time the final administrative decision is made, provide written notice to the employee and his/her representative of the time limits set forth in the Code of Civil Procedure Section 1094.6 within which judicial review must be sought.  (Ord. 95-5 § 2; (Chapter 17(G))." (Italics added.)

Paragraph A of this provision expressly grants *employees* the right to seek judicial review of an administrative decision relating to a termination. It does not grant City the right to seek judicial review of its own administrative decision. This omission from the Municipal Code is not unexpected because local governments and administrative agencies typically do not seek judicial review of their own administrative decisions. Doing so would be the equivalent of a local government saying, "we made the wrong administrative decision and we need the courts to correct our decision for us."

23.

Therefore, we conclude that when the parties agreed that either side could go to court by filing a petition for writ of administrative mandamus under section 1094.5,[15] they agreed to something other than the procedure set forth in the Municipal Code. This specific part of their agreement supports the inference that they agreed to final and binding arbitration because, if they were conducting the usual administrative proceeding, there would be little reason for Clifton to expand City's rights without receiving something in return.

The parties' explicit reference to section 1094.5 supports the inference that they intended to have the agreed-upon judicial review of the arbitration decision subject to the basic requirements governing administrative mandamus. Consequently, their silence as to any deadline for going to court under a petition for writ of administrative mandamus does not mean they intended for there to be no limit on the amount of time. Instead, we infer the parties intended to be subject to the 90-day limitations period set forth in section 1094.6, subdivision (b): "Any such petition shall be filed not later than the 90th day following the date on which the decision becomes final." This 90-day limitations period is jurisdictional. (*Donnellan v. City of Novato* (2001) 86 Cal.App.4th 1097, 1103.) City argues the 90-day limitations period was tolled or otherwise does not apply because no notification was given pursuant to either Municipal Code section 2.36.810, subdivision (B) or subdivision (f) of section 1094.6, which provides: "In making a final decision as defined in subdivision (e), the *local agency shall provide notice* to the party that the time within which judicial review must be sought is governed by this section." (Italics added.) We conclude this notification provision does not apply to the present case because the

---

**15** City acknowledges that it agreed to this term. City's reply brief refers to its "assertion that the parties had previously agreed on the record that the matter would be reviewable by either party by filing a petition for writ of mandamus." Despite acknowledging this specific term, City does not concede the term was part of an agreement *to arbitrate* the dispute.

24.

arbitrator was the one "making a final decision," not the local agency. Alternatively, even if this specific notice provision applied to the arbitrator's decision, it is not objectively reasonable to infer the parties intended to incorporate it into their agreement because doing so would have given City unilateral control over starting the 90-day period, which would have allowed City to implement the short statute of limitations if the decision was favorable to it and avoid the short statute of limitations if the decision was unfavorable.

Based on the foregoing, we conclude that the 90-day period within which to file a timely administrative mandamus petition began on May 24, 2013, when the parties received Chertkov's decision. Using that starting date, neither party came close to filing a timely petition for administrative mandamus. City's writ petition was filed on December 10, 2013, more than six months after the final arbitration decision was received. Clifton's petition to confirm was filed on November 8, 2013, well after the 90-day period for attacking the finality of the arbitration decision had expired.

Another aspect of the parties' stipulation about judicial review is the lack of a description of the scope or type of issues that could be raised in the administrative mandamus proceeding. However, the reference to section 1094.5 demonstrates they regarded *judicial review* of the arbitration award as something different from *confirmation* of that award. Subdivision (f) of section 1094.5 clearly identifies the relief that can be obtained by a petitioner: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ." This mandatory language does not include granting the writ *and* confirming or otherwise enforcing the decision. Thus, the parties' reference to section 1094.5 addresses the mechanism for *challenging* the final and binding character of the arbitrator's decision and does not address how to confirm or enforce that decision once the time for challenges has elapsed.

Fourth, the parties entered into another stipulation that qualified their agreement that the "arbitrator's award in this case will be final and binding." Counsel stipulated to

25.

Chertkov's statement "that the arbitrator will retain jurisdiction upon issuance of award in case there's any problem about implementation of that award."[16] Chertkov's reference to himself as the "arbitrator" instead of the hearing officer supports the inference that the parties intended to conduct an arbitration before an arbitrator, rather than an administrative hearing before a hearing officer. The reservation of authority, which is not part of the procedures specified in the Municipal Code, suggests that the parties agreed to something else, such as an arbitration. There are, of course, conflicting inferences about the exact nature of that proceeding. In other words, the additional stipulation does not *necessarily* mean the proceeding was an arbitration, but that is one of the possible inferences that can be drawn reasonably from the facts presented. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 [when the evidence is uncontroverted, the choice among the conflicting inferences is solely a judicial function]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [same].)

Applying a de novo standard of review, we resolve the ambiguity in the words of the parties' stipulations to mean they agreed (1) the evidentiary hearing ordinarily provided under the Municipal Code would be converted into an arbitration proceeding and (2) the arbitration would be final and binding, except that each side could seek judicial review of the arbitrator's decision by way of a timely writ of administrative mandamus under section 1094.5.[17]

---

[16] For example, there might have been a problem with restoring Clifton's seniority because that action could affect the rights of third parties or with putting Clifton's retirement account in the condition it would have been if he had not been discharged.

[17] Alternatively, even if there was no valid agreement to arbitrate and this matter were governed exclusively by the provisions of the Municipal Code, the City would lose this appeal. If Chertkov's decision is regarded as an administrative decision by a hearing officer, it would be final and binding upon the City pursuant to Municipal Code section 2.36.830, subdivision (G). The exception to finality created by the provision in Municipal Code section 2.36.810, subdivision (A) for judicial review under section 1094.5 is available only for *employees* seeking judicial review. That provision does not authorize the City to seek judicial review of its own administrative decisions.

26.

We recognize the possibility that, from a subjective perspective, City may not have intended to provide Clifton with an arbitration hearing that deviated from the procedures governing administrative proceedings under the Municipal Code. However, the undisclosed subjective intent or expectation of a party is irrelevant to determining the meaning to the language communicated. (*Adams v. MHC Colony Park L.P.* (2014) 224 Cal.App.4th 601, 620, fn. 18.) A party is responsible for the objectively reasonable expectations created by the words and actions communicated to the other party. (See *Merced Sheriff*, *supra*, 188 Cal.App.3d at p. 670.) Here, an objectively reasonable interpretation of the words and actions of the parties in light of the surrounding circumstances leads to the conclusion that they agreed to an arbitration that would follow some, but not all, of the procedures in the Municipal Code.

       D.      <u>Trial Court's Authority to Confirm the Arbitration Award</u>

              *1.      Statutory Authority to Confirm*

Based on our conclusion that the parties entered into a valid arbitration agreement, it follows that the trial court had the authority to enter an order confirming the arbitration award. Section 1286 grants superior courts the authority to confirm arbitration awards in accordance with the requirements of the California Arbitration Act (§ 1280, et seq.). Pursuant to this statutory authority, the trial court could determine the parties entered into an arbitration agreement and confirm the arbitrator's award. (See § 1285 [petitions to confirm arbitration award].)

The parties' agreement did not deprive the trial court of its authority under the California Arbitration Act. The agreement about going to court to seek a writ of administrative mandamus was limited to the mechanism for *challenging* the award and did not reach the question of how to *confirm* the arbitrator's award. The agreement's lack of an explicit statement of the procedure for confirmation does not negate the trial court's statutory authority to confirm arbitration awards. Stated another way, California's rules

27.

of contract law filled any gap in the agreement about enforcement procedures by incorporating applicable law in existence when the contract was made. (See *Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1181 [existing laws form part of the contract as if expressly referred to and incorporated].) In this case, the applicable laws include the California Arbitration Act.

### 2. *Municipal Code Provision Limiting Judicial Review*

City contends it has the power, under the California Constitution, the Government Code, and its charter, to make laws governing city affairs. From this foundation, City argues that Municipal Code section 2.36.810 provides the sole means of invoking judicial review of the arbitrator's decision. Based on this view, City contends Clifton's petition to confirm the award was the incorrect judicial procedure for enforcing the award and the confirm order must be reversed.

First, City's argument fails because the parties agreed to an arbitration that modified the procedures set forth in the Municipal Code, including the judicial review provisions of Municipal Code section 2.36.810. (See pt. II.C.3, *ante*.)

Second, the trial court interpreted the parties' agreement and Municipal Code section 2.36.810 as addressing judicial review, which it distinguished from judicial confirmation of the arbitration award. We agree with this interpretation. The parties agreed that the arbitrator's award would "be final and binding unless one of the parties wanted to go to Superior Court on a writ [of administrative mandate.]" The use of the phrase "go to Superior Court" as an exception to the award being "final and binding" demonstrates the purpose of going to court is to *challenge* the finality or the binding nature of the award, not to *enforce* a final and binding award. The reference to section 1094.5 reinforces this intent because the judgments allowed under its subdivision (f) do not include granting a petition *and* confirming the underlying decision. Therefore, we

reject City's argument that Municipal Code section 2.36.810 sets for the exclusive method for enforcing the arbitrator's award rendered pursuant to the parties' agreement.

III.    SUBSTITUTION OF JUDGMENT AND PUBLIC POLICY

City contends that the arbitrator improperly substituted his judgment as to punishment. In City's view, there was no showing that City abused its discretion in terminating Clifton.

City's arguments on appeal fail to take into account a change involving the grounds for termination that occurred between the issuance of the notice of termination and the hearing before the arbitrator. The notice of termination referred to the grounds set forth in the notice of intent to terminate. The most serious grounds listed in the notice of intent to terminate were (1) a violation of the department's policy and procedure manual section 340.3.5(z), violating a felony or misdemeanor statute, and (2) a violation of Penal Code section 417, which addresses the drawing and exhibiting of a firearm.[18] Footnote 6 of the arbitrator's decision stated: "During the arbitration hearing, [City] dropped the allegations of violation of Police Department Policy and Procedure Manual Section 340.3.5(z), violating any misdemeanor or felony statute, and violation of Penal Code 417."

In effect, the arbitrator determined that punishment based on Clifton's commission of a misdemeanor or felony was no longer appropriate once Clifton established and City

---

[18]    Subdivision (a)(2) of Penal Code section 417 states: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable as follows: [¶] (A) If the violation occurs in a public place and the firearm is a pistol, revolver, or other firearm capable of being concealed upon the person, by imprisonment in a county jail for not less than three months and not more than one year, by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment. [¶] (B) In all cases other than that set forth in subparagraph (A), a misdemeanor, punishable by imprisonment in a county jail for not less than three months."

conceded no crime had been committed. (Cf. *Taylor*, *supra*, 24 Cal.3d at p. 446 [arbitrator changed discipline of police officer from discharge to a 30-day suspension; arbitrator found it significant that the district attorney expressly determined the officer's off-duty shooting of suspected burglar did not warrant criminal prosecution].) The record before this court and the analysis adopted in *Taylor* shows the arbitrator could have reasonably determined that the punishment was rendered arbitrary and capricious (particularly in the workplace environment described earlier) because the most egregious basis for the discipline—namely, drawing and pointing his firearm "in a rude, angry, or threatening manner" (Pen. Code, § 417, subd. (a)(2))—was not supported by the evidence.

In summary, Clifton was terminated for violating a Penal Code provision that defined certain actions as a felony or misdemeanor. During the arbitration, the evidence presented showed Clifton's actions were not a crime and those grounds were withdrawn. The withdrawal of those grounds was sufficient to establish that Clifton's discharge was out of proportion to the misconduct and justified the arbitrator's reduction of the discipline imposed.

## DISPOSITION

The order confirming the arbitration award is affirmed. Respondent shall recover his costs on appeal.

_____

FRANSON, J.

WE CONCUR:

_____

KANE, Acting P.J.

_____

POOCHIGIAN, J.